T.C. Memo. 2002-172


UNITED STATES TAX COURT


DONALD G. OREN AND BEVERLY J. OREN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2681-00.                    Filed July 19, 2002.


<u>Myron L. Frans</u>, for petitioners.

<u>John C. Schmittdiel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, <u>Judge</u>:  Respondent determined the following

deficiencies with respect to petitioners' Federal income taxes:

| Year | Amount |
|------|--------|
| 1993 | $1,375,232 |
| 1994 | 2,138,632 |
| 1995 | 1,777,271 |

The issues for decision are: (1) Whether petitioners had sufficient basis in indebtedness under section 1366(d)[1] from which to deduct losses from two wholly owned S corporations; and (2) whether petitioners were at risk under section 465 for certain loans made to the two S corporations.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners Donald G. Oren (Mr. Oren) and Beverly J. Oren (Mrs. Oren) resided in Roseville, Minnesota, at the time they filed their petition. Petitioners owned stock in several S corporations. Those corporations performed various functions which together formed the nexus for petitioners' trucking business.

Dart Transit Company (Dart) was formed in 1934 by Mr. Oren's father and was incorporated in 1938 under Minnesota law. In 1993, 1994, and 1995, Dart held a 48-State authority and operated throughout the United States and in some provinces in Canada. During that time period, Dart was in the process of expanding and positioned itself in the "high service just-in-time" segment of the truckload carrier industry. Dart offered premium truckload carrier services to retailers and manufacturers of products such

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue.

as haul containers, paper, department store merchandise, building materials, appliances, plastics and rubber products, and miscellaneous items. Dart owned no tractors of its own and used tractors operated only by independent contractors.

The following table details some of Dart's business operations for 1993, 1994, and 1995:

| | | Item | | | |
|---|---|---|---|---|---|
| Year | Revenues | Net Income | Ordinary Income | Employees | Trailers |
| 1993 | $130,034,000 | $2,858,133 | $5,294,491 | 220 | 1,669 |
| 1994 | 149,039,000 | 4,539,008 | 10,089,762 | 241 | 1,669 |
| 1995 | 168,172,000 | 3,067,744 | 4,667,063 | 245 | 2,066 |

Mr. Oren did not become involved in the operations of Dart until 1953. However, Mr. Oren would become the principal force behind Dart's and, another company, Fleetline's position in the truckload carrier business. Mrs. Oren was also involved in the trucking business, for more than 20 years, and was in charge of Dart's human resources. Mr. and Mrs. Oren were the only directors of Dart in 1993, 1994, and 1995. Mr. Oren also served as president/ treasurer, and Mrs. Oren served as executive vice president/ secretary.

Dart had two classes of common stock, class A voting stock (33,000 shares) and class B nonvoting stock (3,267,000 shares). Both classes had equal distribution and liquidation rights. Mr. Oren owned all the class A voting stock. Overall, the common stock of Dart, including both the class A voting and class B

nonvoting stock, was owned by the following parties and in the following percentages:

| Owners | Common Stock Ownership Percentage | | |
|---|---|---|---|
| | 1993 | 1994 | 1995 |
| Donald G. Oren | 74.94% | 54.95% | 54.95% |
| Beverly J. Oren | 6.33 | 6.33 | 6.33 |
| David Oren | 0.26 | 5.25 | 5.25 |
| Daniel Oren | 0.26 | 5.25 | 5.25 |
| Bradley Oren | 0.26 | 5.25 | 5.25 |
| Angela Oren | 0.26 | 5.25 | 5.25 |
| Trust for David Oren | 4.43 | 4.43 | 4.43 |
| Trust for Daniel Oren | 4.43 | 4.43 | 4.43 |
| Trust for Bradley Oren | 4.43 | 4.43 | 4.43 |
| Trust for Angela Oren | 4.43 | 4.43 | 4.43 |

David, Daniel, Bradley, and Angela Oren are petitioners' children.  In 1992, David was age 34; Daniel was 32; Bradley was 27; and Angela was 14.  The trusts owning stock in Dart were all qualified subchapter S trusts under section 1361(d)(1)(B).  The trusts were irrevocable, and all rights incident to the ownership of the stock were exercised by trustees.  None of the trustees were employed by or held shares in any of the trucking companies; the trustees were in all respects independent.  Dart elected to be taxed under subchapter S of the Code for taxable years 1993, 1994, and 1995.[2]  See sec. 1362(a).

Mr. Oren testified that he and his wife attended seminars on estate planning and made estate planning one of their top business priorities.  As a result, Mr. and Mrs. Oren engaged in a

---

[2]Dart was formerly a C corporation and still had accumulated earnings and profits in 1993, 1994, and 1995, attributable to its C corporation existence.

program of annual gifting of Dart shares to their children and to irrevocable trusts for the benefit of the children. Petitioners reported taxable gifts in excess of $5.5 million for taxable years 1992, 1993, and 1994 and paid approximately $2 million in gift taxes.

In 1982, Mr. Oren established a second truckload carrier company in Texas called Fleetline, Inc. (Fleetline). This company performed services similar to those of Dart. Fleetline's stock was owned entirely by Mr. Oren.

Highway Leasing (HL) was incorporated in 1987 as a Minnesota corporation. All the stock of HL was owned by Mr. Oren. Mr. Oren served as the president/treasurer of HL, and Mrs. Oren served as secretary. Mr. Oren was the only director of HL. HL was in the business of acquiring and leasing trailers. HL leased the trailers to Dart, Fleetline, and other parties. The following table details some of the business operations of HL for 1993, 1994, and 1995:

| | | | Item | |
| | | | Ordinary | |
| Year | Revenues | Net Income | Income | Trailers |
|------|----------|------------|--------|----------|
| 1993 | $6,295,000 | $965,237 | $(2,845,625) | 2,068 |
| 1994 | 8,587,000 | 635,746 | (4,459,488) | 2,550 |
| 1995 | 10,919,000 | 2,447,233 | (6,825,523) | 3,847 |

HL elected to be taxed as an S corporation for taxable years 1993, 1994, and 1995.

Highway Sales (HS) was incorporated in 1971 as a Minnesota corporation. All the stock of HS was owned by Mr. Oren. Mr.

Oren also acted as the treasurer of the company, and Mrs. Oren acted as vice president/secretary during 1993, 1994, and 1995. Mr. Oren and Mrs. Oren were the only directors of HS.  HS purchased tractors which HS then leased under a "lease-to-purchase" program.  HS leased the tractors to individuals who wanted to become owner-operators of the tractors.  The profitability of HS was dependent on its ability to purchase a number of tractors at wholesale prices and to lease those same tractors to individuals willing to own their own trucks and drive them.  The following table details some of the business operations of HS for 1993, 1994, and 1995:

| | | | Item | | |
| | | | Ordinary | | |
| Year | Revenues | Net Income | Income | Employees | Tractors |
|---|---|---|---|---|---|
| 1993 | $8,361,000 | $1,634,071 | $(1,511,830) | 11 | 852 |
| 1994 | 11,202,000 | 322,689 | (1,773,473) | 19 | 1,231 |
| 1995 | 13,798,000 | 1,451,609 | 482,405 | 19 | 1,184 |

HS also elected to be taxed as an S corporation for taxable years 1993, 1994, and 1995.

The various entities, Dart, Fleetline, HL, and HS, were kept separate from one another in order to:  (1) Minimize exposure to liability by keeping as many assets as possible out of the primary truckload carriers, Dart and Fleetline; (2) promote accountability within each segment of the trucking business; (3) maintain flexibility of operations; (4) permit financial results to be reported separately; and (5) facilitate family and estate planning.

On July 1, 1991, Dart, Fleetline, HS, and HL entered into a credit agreement with First Bank National Association (First Bank), which provided for a letter of credit, a revolving note, and a security agreement. The credit agreement restricted distributions from the Dart companies to petitioners' expected tax liability plus 10 percent of net income. On August 16, 1993, the agreement was amended to allow distributions to petitioners so long as they made equivalent cash contributions to one of the other Dart companies. The agreement also stated:

> Section 6.10 Investments. No Borrower [any of the Dart Companies] will acquire for value, make, have or hold any Investments, except:
>
> *   *   *   *   *   *   *
>
> 6.10(f) Loans by Dart to Donald G. Oren, but only so long as contemporaneous loans of equal amount from Donald G. Oren to another Borrower remain outstanding.

Beginning in 1992, HL purchased additional trailers for use in its business. The trailers would have given rise to depreciation deductions that would have exceeded Mr. Oren's basis in his S stock. Mr. Oren would have been unable to deduct the full amount of the losses as a result of section 1366(d), which limits losses to the sum of a shareholder's basis in the S corporation stock and the shareholder's basis in indebtedness of the S corporation to the shareholder. Mr. Oren was advised by his tax advisers to "restructure" his financial investments in

his various companies so that he might receive the benefit of the ordinary loss deductions.  Mr. Oren followed the advice of the tax advisers and entered into a series of lending transactions for the purpose of increasing basis in HL.[3]

On December 22, 1993, Dart lent $4 million to Mr. Oren.  Mr. Oren executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on December 22, 1994, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#133680) from Dart to Mr. Oren drawn on Dart's account with First Bank Havre (Havre).[4]

On December 22, 1993, Mr. Oren lent $4 million to HL.  HL executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on December 22, 1994, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#2720) from Mr. Oren to HL drawn on Mr. Oren's account with Fidelity Investments (Fidelity).

---

[3]Even though Mr. Oren ultimately chose to use funds lent by Dart to finance his investments in HL, Mr. Oren testified that he had the personal resources to finance the investments without borrowing from Dart.

[4]Mr. Oren testified that Dart had a zero balance account (ZBA).  With respect to a ZBA, each time that Dart wrote a check, it would be drawing on its line of credit with the bank.

On December 22, 1993, HL lent $4 million to Dart.  Dart executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on December 22, 1994, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#2305) from HL to Dart drawn on HL's account with First Bank Minneapolis (Minneapolis).

On September 22, 1994, Dart lent $5 million to Mr. Oren.  Mr. Oren executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on September 22, 1995, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a wire transfer from First Bank National Association to Mr. Oren's Fidelity account.

On September 22, 1994, Mr. Oren lent $5 million to HL.  HL executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on September 22, 1995, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#2875) from Mr. Oren to HL drawn on Mr. Oren's Fidelity account.

On September 22, 1994, HL lent $5 million to Dart.  Dart executed a note which provided that principal was due 375 days

following demand.  Interest accrued at a 7-percent annual rate and was due on September 22, 1995, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#2402) from HL to Dart drawn on HL's account with Havre.

On September 15, 1995, Dart lent $4.4 million to Mr. Oren. Mr. Oren executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on September 15, 1996, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#164603) from Dart to Mr. Oren drawn on Dart's account with Havre.

On September 27, 1995, Mr. Oren lent $4.5 million to HL.  HL executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on September 27, 1996, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#3066) from Mr. Oren to HL drawn on Mr. Oren's Fidelity account.

On September 27, 1995, HL lent $4.5 million to Dart.  Dart executed a note which provided that principal was due 375 days following demand.  Interest accrued at a 7-percent annual rate and was due on September 27, 1996, and on the same day of each

year thereafter. The proceeds of the loan were distributed in the form of a check (#2512) from HL to Dart drawn on HL's account with Havre.

In 1995, a similar problem arose with HS. HS purchased tractors and the accelerated depreciation deductions from those tractors were anticipated to exceed Mr. Oren's basis in HS. Mr. Oren restructured his investments to increase his basis in HS.

On December 8, 1995, Dart lent $1.9 million to Mr. Oren. Mr. Oren executed a note which provided that principal was due 375 days following demand. Interest accrued at a 7-percent annual rate and was due on December 8, 1996, and on the same day of each year thereafter. The proceeds of the loan were distributed in the form of a check (#168445) from Dart to Mr. Oren drawn on Dart's account with Havre.

On December 21, 1995, Mr. Oren lent $2 million to HS. HS executed a note which provided that principal was due 375 days following demand. Interest accrued at a 7-percent annual rate and was due on December 21, 1996, and on the same day of each year thereafter. The proceeds of the loan were distributed in the form of a check (#3088) from Mr. Oren to HS drawn on Mr. Oren's Fidelity account.

On December 21, 1995, HS lent $2 million to Dart. Dart executed a note which provided that principal was due 375 days

following demand.  Interest accrued at a 7-percent annual rate and was due on December 21, 1996, and on the same day of each year thereafter.  The proceeds of the loan were distributed in the form of a check (#16973) from HS to Dart drawn on HS' account with Minneapolis.

Mr. Oren signed all the above notes either in his individual capacity or as president of Dart or HL.  The only exception was the note from HS to Mr. Oren which was signed by John Seibel, president of HS.

Mr. Oren's financial statements for 1993 and 1995 do not reflect Mr. Oren's loan obligations to Dart or the loan obligations from HL and HS to Mr. Oren.  The 1993 and 1994 combined balance sheets for the Dart companies do not reflect the loan obligations between Dart and Mr. Oren, Mr. Oren and HL, and HL and Dart.[5]  The 1995 combined balance sheet for the Dart

---

[5]The combined schedule of balance sheet information for 1993 provides the following relevant information (in thousands):

| | Dart | Fleetline | HS | HL | Eliminations | Total |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Notes receivable-affiliate | $5,901 | --- | --- | $4,000 | ($9,598) | $303 |
| LIABILITES | | | | | | |
| Notes payable-affiliate | 4,000 | $1,598 | --- | 4,000 | (9,598) | --- |

The total of $303,000 was listed on the combined balance sheet of the Dart companies as an asset.  The combined schedule of balance sheet information for 1994 provides the following relevant information (in thousands):

| | Dart | Fleetline | HS | HL | Eliminations | Total |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Notes receivable- | | | | | | |

(continued...)

companies does not reflect the various loans between the Dart companies and Mr. Oren, except for the $200,000 that Mr. Oren lent to HL and HS from his own personal resources.[6]  That amount is listed as a "NOTES PAYABLE-Stockholder".[7]

---

[5](...continued)

| | | | | | | |
|---|---|---|---|---|---|---|
| affiliate | ($7,307) | --- | $181 | $9,000 | ($1,598) | $276 |
| LIABILITES | | | | | | |
| Notes payable-affiliate | (9,000) | 1,598 | --- | 9,000 | (1,598) | --- |

The total of $276,000 was listed on the combined balance sheet as an asset of the Dart companies.

[6]The combined schedule of balance sheet information for 1995 provides the following relevant information (in thousands):

| | Dart | HS | HL | Total |
|---|---|---|---|---|
| ASSETS | | | | |
| Notes receivable-affiliate | $325 | --- | --- | $325 |
| LIABILITES | | | | |
| Notes payable-stockholder | (15,300) | $2,000 | $13,500 | 200 |
| Notes payable-affiliate | 16,037 | (2,000) | (13,500) | 537 |

The totals of $325,000, $200,000, and $537,000, are listed on the combined balance sheet of the Dart companies under "Notes receivable-Affiliate", "NOTES PAYABLE-Stockholder", and "NOTES PAYABLE-Affiliate", respectively.  Note 7 to the combined balance sheet then states:  "The notes payable to stockholder and affiliate are due 375 days from the date the holders of the notes request payment.  The interest rates of the notes are fixed at 7.0%."

[7]The parties stipulated an exhibit identified as Accounting Research Bulletin No. 51, Consolidated Financial Statements, which provides in relevant part:

In the preparation of consolidated statements, intercompany balances and transactions should be eliminated.  This includes intercompany open account balances, security holdings, sales and purchases, interest, dividends, etc.  As consolidated statements

(continued...)

Mr. Oren paid interest in 1994, 1995, and 1996 on the loans made from Dart to Mr. Oren:

| Date | Interest Payment | Check No. (Fidelity) |
|------|-----------------|---------------------|
| 12-22-94 | $280,000.00 | 3008 |
| 10-11-95 | 553,288.00 | 3073 |
| 12-12-96 | 1,254,246.58 | 3238 |

HL paid interest in 1994, 1995, and 1996 on the loans from Mr. Oren to HL:

| Date | Interest Payment | Check No. (Havre) |
|------|-----------------|-------------------|
| 12-21-94 | $280,000.00 | ???? |
| 09-27-95 | 553,288.00 | 2509 |
| 12-03-96 | 1,121,917.81 | 2641 |

HS also paid interest on the 1995 loan from Mr. Oren:

| Date | Interest Payment | Check No. (Minneapolis) |
|------|-----------------|------------------------|
| 12-04-96 | $132,712.33 | 19438 |

Dart paid interest in 1994, 1995, and 1996 on the loans made from HL to Dart:

| Date | Interest Payment | Check No. (Havre) |
|------|-----------------|-------------------|
| 12-23-94 | $280,000.00 | 150561 |
| 09-27-95 | 553,288.00 | 164844 |

---

[7](...continued)
are based on the assumption that they represent the financial position and operating results of a single business enterprise, such statements should not include gain or loss on transactions among the companies in the group.

The various offsets of the loan obligations among Dart, HL, and HS on the 1993, 1994, and 1995 combined schedule of balance sheet information, are explained by this document. However, this document does not explain the absence of the loans involving Mr. Oren on the 1993 and 1994 statements.

| 12-04-96 | 1,121,917.81 | 186558 |

Dart also paid interest to HS in 1996 on the loan made from HS to Dart:

| Date | Interest Payment | Check No. (Havre) |
| --- | --- | --- |
| 12-04-96 | $132,712.33 | 186559 |

Dart paid the following amounts to HL and HS on December 19, 1996:

| Payee | Payment | Check No. (Havre) |
| --- | --- | --- |
| HL | $13,549,191.78 | 187346 |
| HS | 2,007,287.67 | 187347 |

The notes that Dart executed for the benefit of HL were marked "Paid 12/19/96 check # 187346". The note that Dart executed for the benefit of HS was marked "Paid 12/19/96 check # 187347".

HL paid the following amounts to Mr. Oren on December 19, 1996:

| Payment | Check No. (Havre) |
| --- | --- |
| $100,364.38 | 2650 |
| 13,448,827.40 | 2651 |

The notes that HL executed for the benefit of Mr. Oren were marked "Contribute to Capital * * * 12/18/96".

HS paid the following amounts to Mr. Oren on December 19, 1996:

| Payment | Check No. (Minneapolis) |
| --- | --- |
| $100,364.38 | 19565 |
| 1,906,923.29 | 19566 |

The note that HS executed for the benefit of Mr. Oren was marked "Contribute to Capital * * * 12/18/96".

On December 23, 1996, Mr. Oren satisfied his notes to Dart, by endorsing the checks he received from HS (#19566) of $1,906,923.29 and HL (#2651) of $13,448,827.40 to Dart's bank account. The notes that Mr. Oren executed for the benefit of Dart bear a notation reflecting this payment method.

Mr. Oren made total contributions of $19 million to HL and HS in 1996.[8] On December 23, 1996, Mr. Oren made capital contributions of $1,198,735.36 and $1,301,264.64 to HS. On December 27, 1996, Mr. Oren made a capital contribution of $16.5 million to HL. Distributions from Dart provided Mr. Oren with the funds needed to make those contributions. The distributions were made pro rata to all shareholders of Dart.

Petitioners deducted losses from HL and HS on Form 1040, U.S. Individual Income Tax Return, in the following amounts:

|    | 1993 | 1994 | 1995 |
|----|------|------|------|
| HL | ($4,000,000) | ($4,614,944) | ($5,605,248) |
| HS | (146,384) | (66,363) | (2,046,251) |

---

[8]On the advice of their tax advisers, petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for taxable year 1996. Attached to that return is a document which states that the return was being filed as a protective claim. Petitioners stated that if they should lose the Tax Court case, they were claiming sufficient basis in 1996 from which to deduct the losses. Petitioners based their claim on the capital contributions made in 1996 by Mr. Oren to HL and HS.

On December 6, 1999, respondent issued a notice of deficiency for taxable years 1993, 1994, and 1995 in which he determined:

7.A. Loss on Highway Leasing
The deductions of $4,000,000, $4,614,944, and $5,605,248, shown on your returns for the taxable years 1993, 1994, and 1995, respectively, as losses from Highway Leasing are not allowable for 1993 and 1994 and is reduced by $4,785,056 for 1995 because the loans from Dart Transit through Donald Oren to Highway Leasing and then back to Dart Transit do not create indebtedness and at-risk basis. Accordingly, your taxable income is increased $4,000,000 for 1993, $4,614,944 for 1994, and $4,785,056 for 1995.

7.B. Loss on Highway Sales
The deduction of $2,046,251 shown on your return for 1995 as a loss from Highway Sales is reduced by $1,900,000 because the loans from Dart Transit through Donald Oren to Highway Sales, Inc. and then back to Dart Transit do not create indebtedness and at-risk basis. Accordingly, your taxable income is increased $1,900,000 for 1995.

OPINION

Issue 1

The first issue for decision is whether petitioners' basis in the indebtedness of two wholly owned S corporations was increased under section 1366(d) as a result of certain direct loans made by petitioners to those entities. Generally, it is the burden of the taxpayer to establish his basis in the S corporation under section 1366(d).[9] Estate of Bean v. Commissioner, 268 F.3d 553, 557 (8th Cir. 2001), affg. T.C. Memo.

---

[9]Petitioners do not argue that sec. 7491(a) applies, and it is otherwise unclear when the examination by respondent commenced. We find sec. 7491(a) is not applicable to this case.

2000-355; <u>Parrish v. Commissioner</u>, 168 F.3d 1098, 1102 (8th Cir.

1999), affg. T.C. Memo. 1997-474.

Section 1366(d) provides:

SEC. 1366. PASS-THRU OF ITEMS TO SHAREHOLDERS.

*     *     *     *     *     *     *

(d) Special Rules for Losses and Deductions.--

(1) Cannot exceed shareholder's basis in stock and debt.--The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of--

(A) the adjusted basis of the shareholder's stock in the S corporation (determined with regard to paragraph (1) of section 1367(a) for the taxable year), and

(B) the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder (determined without regard to any adjustment under paragraph (2) of section 1367(b) for the taxable year).

The legislative history of section 1366(d) indicates that losses

are deductible only to the extent of one's "investment" in the S

corporation, which includes cash outlays as well as loans to the

corporation from the shareholder.  The Senate Finance Committee

Report states:

The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) [a predecessor of section 1366(d)] to the adjusted basis of the shareholder's <u>investment</u> in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder. * *

* [S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1141; emphasis added.]

Respondent determined that the loans Mr. Oren made to HL and HS did not involve an economic outlay by petitioners and did not increase basis under section 1366(d).  Respondent argues that the transactions did not leave petitioners "poorer in any material sense" and did not result in "any significant change" in petitioners' "economic wealth".[10]

Petitioners suggest that the loans from Mr. Oren to HL and HS, when viewed separately, were bona fide debts for purposes of section 1366(d).  Petitioners contend that the "other" loan transactions (i.e., the loans from HL to Dart and from HS to Dart) should not upset the validity of those loans.  Petitioners also argue that Mr. Oren's personal economic wealth was changed significantly as a result of the loan transactions since he was personally indebted to Dart for repayment of the loan proceeds.

In the context of a shareholder's guaranty of a loan for the benefit of an S corporation, there has been some dispute as to whether a guaranty can ever satisfy the requirements of section 1366(d)(1).  Most of the cases dealing with the issue have determined that, as a matter of law, a mere guaranty does not give rise to basis in indebtedness under section 1366(d)(1)(B),

---

[10]Respondent does not challenge the bona fides of the entities created by petitioners or the overall structure of the trucking business adopted by petitioners.

because there has not been an "actual economic outlay" by the shareholder to the corporation.  See, e.g., <u>Estate of Bean v. Commissioner</u>, <u>supra</u> at 558-559; <u>Estate of Leavitt v. Commissioner</u>, 90 T.C. 206, 211 (1988), affd. 875 F.2d 420 (4th Cir. 1989).[11]  Petitioners argue that funds lent directly from a shareholder to an S corporation create basis under section 1366(d), and an actual economic outlay is not required, even if other transactions offset the direct loan.  Petitioners argue that an actual economic outlay is required only where there is a shareholder guaranty.  Essentially, petitioners are arguing that the "form" of a direct loan from a shareholder to an S corporation is sufficient to increase basis in indebtedness under section 1366(d)(1)(B).

A shareholder must make an actual economic outlay to increase basis in an S corporation, even if the shareholder has made a direct loan.  <u>Bergman v. United States</u>, 174 F.3d 928, 932 (8th Cir. 1999); <u>Underwood v. Commissioner</u>, 535 F.2d 309, 311-313 (5th Cir. 1976), affg. 63 T.C. 468 (1975).  Indeed, in <u>Bergman v. United States</u>, <u>supra</u> at 933, the Court of Appeals for the Eighth Circuit stated:

> The economic outlay doctrine does not apply only to loan guarantees, but it has been used to explain that a shareholder who guarantees a bank loan to an S corporation does not create additional basis because he

---

[11]But see <u>Selfe v. United States</u>, 778 F.2d 769 (11th Cir. 1985).

> is only secondarily and conditionally liable. The principle underlying the doctrine extends beyond such circumstances to transactions which purport to be direct loans. * * * [Citations omitted.]

Thus, "A taxpayer claiming a deduction [under section 1366(d)(1)] must show it was based on 'some transaction which when fully consummated left the taxpayer poorer in a material sense.'" Id. at 932-933 (quoting Perry v. Commissioner, 54 T.C. 1293, 1296 (1970), affd. 27 AFTR 2d 71-1464, 71-2 USTC par. 9502 (8th Cir. 1971)). Our concern under section 1366(d)(1)(B) is whether a shareholder has, in substance, lent money to the S corporation. See id., at 930 n.6.

The various disbursements in 1993, 1994, and 1995 were the equivalent of offsetting bookkeeping entries, even though they occurred in the form of checks and a wire transfer. For example, in 1993, Dart lent $4 million to Mr. Oren, Mr. Oren lent $4 million to HL, and HL lent $4 million to Dart. The loan transactions did not have a net economic effect. None of the $4 million that Dart lent to Mr. Oren was retained by a party other than Dart.[12] Indeed, the loan proceeds originated with Dart and ended with Dart. The only significance of the transactions was the circular route of the various checks and the wire transfer

---

[12]For an investment, we would at a minimum expect that the S corporation would retain the loan proceeds for use in its business operations. In this case, the loans to HL and HS simply entered the "front door", immediately exited through the "back door", and were returned to Dart.

and the execution of promissory notes.  The economic positions of the parties did not change.[13]  The same is true of the loan transactions in 1994 and 1995.

The execution of the promissory notes did not result in the parties' becoming poorer in any material sense.  The promissory notes, with the exception of the note from HS, were all executed by Mr. Oren as president of Dart and HL, or as an individual. The terms of the promissory notes were not the equivalent of terms which might appear in notes executed for the benefit of unrelated third parties, especially in light of the size of the loans.  The loans were unsecured and were in the form of notes due 375 days following demand.  Further, petitioners, in their various roles as the only directors, principal officers, and majority or sole shareholders of the Dart companies, and Mr. Oren as individual-obligee, controlled when and whether a demand for repayment would be made.

The loan principal repayments and the payments of interest also denote the inherent lack of substance in the loans.  The repayment of loans occurred only after respondent challenged the

---

[13]Respondent suggests that petitioners' restructuring of investments, if upheld, permits taxpayers to create basis "out of thin air" and "double count" basis in two S corporations and that there would be no limit to the amount of basis that could be created by the simple exchange of offsetting notes.

loan transactions that occurred in 1993, 1994, and 1995.[14] The repayments did not follow the procedures specified in the promissory note; i.e., payment 375 days after demand.[15] The repayments occurred all at once and via the same circular route as the initial disbursements. Mr. Oren simply endorsed the checks he received from HL and HS over to Dart. The interest payments, like the disbursements and repayments, were wholly circular. The interest payments from Mr. Oren to Dart, from HL and HS to Mr. Oren, and from Dart to HL and HS, were in the same amounts and were made contemporaneously. The interest payments, like the disbursements and repayments, were economically

---

[14]At trial, Mr. Oren testified as follows:

Q    And what did your tax adviser recommend to you once they found out the IRS was challenging these loans?

A    Well, they recommended that Dart pay a dividend to me and that I use that dividend to pay off the loans to Highway Sales and Highway Leasing, and so at that point all the loans were repaid.

[15]Petitioners suggest that the repayment method adopted should not affect the substance of the original distribution of funds. However, as we see it, the substance of the loan transactions should be determined on the basis of all facts and circumstances, including the circumstances surrounding repayment. Petitioners also argue that the repayment of the loans was "fully consistent with sound commercial practice." However, Mr. Oren's testimony at trial and the record show that the only reasons for the repayments were to unwind the previous transactions and to salvage whatever tax results might be forthcoming for taxable year 1996.

insignificant.  The parties were in exactly the same position before the interest payments as they were afterwards.

Petitioners point to our decision in Gilday v. Commissioner, T.C. Memo. 1982-242, and emphasize that direct shareholder loans, like the loans in this case, create basis.  Petitioners argue that the facts in that case are similar to those herein.  In Gilday, the taxpayers substituted their own personal note for the note of an S corporation that had been executed in favor of a third-party bank.  This Court found that the taxpayers had become primary obligors on the loan obligation to the bank and allowed the taxpayers to increase their basis accordingly.  Id.

However, "the involvement of an independent third party lender" was essential to the result reached in Gilday v. Commissioner, supra.  Bergman v. United States, 174 F.3d at 933. In this case, the "lender", Dart, was a controlled entity.  Mr. Oren owned all the voting stock and a majority of the nonvoting stock, and, further, Mr. and Mrs. Oren were the only directors of Dart and acted as its president/treasurer and executive vice president/secretary, respectively.  Petitioners argue that a third-party lender is not required where there is a direct loan to an S corporation.  We agree with the rationale in Bergman v. United States, supra, and hold that a third-party lender is generally required.  With a third-party lender, "there is no question that * * * [the] lender * * * intends to force

repayment, truly placing the shareholder's money at risk." Id. at 933. But, with a controlled entity, "it may be unclear whether the shareholder or the corporation is placed at risk." Id. In such a case, the taxpayer must overcome a "a heavy burden" and demonstrate that the loans were bona fide and had "economic impact". Id.

Petitioners attempt to overcome this heavy burden and cite several factors which suggest that Mr. Oren would be required to make repayment to Dart in all events. Petitioners claim that a default on the part of Dart, HL, or HS on the various loan obligations could have triggered a chain reaction that would have forced Mr. Oren to pay Dart out of his own assets. We cannot agree.

Dart was a financially stable and expanding company. Petitioners presented no evidence that would lead us to believe that Dart would have been unable to repay its loan obligations to HL and HS. The same is true of HL and HS. Both companies were financially viable and expanding. Further, given Mr. Oren's multicompany structure, HL's and HS's assets did not face the same risks that were associated with the carrier companies, Dart and Fleetline. We can conclude that a default on the notes by any of the Dart companies was highly unlikely. In any event, it is highly improbable that Dart would have made demand on Mr. Oren to repay his loans from Dart. Any demand on Mr. Oren would

surely have triggered a demand by Mr. Oren of HL and HS. Assuming a demand by HL or HS of Dart, the entire series of demands would simply offset, leaving the parties exactly where they started. Any demands for repayment would have been futile, because each party would have had equivalent rights of demand against other parties in the circular chain of obligations.[16] The loans in this case were nothing more than a tripartite, interconnected arrangement that, as a practical matter, would not have given rise to an obligation on the part of Mr. Oren to repay from his personal resources.

Petitioners also argue that the Dart minority shareholders had rights under Minnesota law allowing them to recover on the loans made from Dart to Mr. Oren.[17] Petitioners contend that the minority shareholders would have forced Mr. Oren to repay the loans, even if HL or HS were unable to repay their loans to Mr. Oren. We disagree. A demand for repayment on the part of the minority shareholders of Dart would surely have triggered a demand on HL or HS for repayment which would in turn trigger

---

[16]Compare this result to the facts in Gilday v. Commissioner, T.C. Memo. 1982-242. After the substitution of notes, the taxpayers, as primary obligors, would have to repay the loans whether the S corporation was or was not able to supply the taxpayers with equivalent amounts. In that case, the taxpayers might truly have to repay with personal funds.

[17]Petitioners cite to Minn. Stat. Ann. sec. 302A.467 (West 1985) and Minn. Stat. Ann. sec. 302A.751 (West Supp. 2001), which discuss equitable relief and shareholder suits.

Dart's loan obligations to HL or HS. In the end, the parties would have advanced no further nor taken any steps back from where they had started. In any event, the minority shareholders of Dart were petitioners' children and trusts for the benefit of those children. We cannot agree that the children or the trustees would have made demand for repayment premature to Mr. Oren's own wishes, especially considering other circumstances which demonstrate that Mr. Oren had exclusive control of all matters within the Dart companies: Mr. Oren's ownership of all voting stock in the Dart companies, his orchestration of the loan transactions in 1993, 1994, and 1995, his exclusive control over repayment in 1996, his initiation of the First Bank credit amendments in 1993, and the distributions that occurred in 1996 from Dart to its shareholders.

Petitioners also argue that the loan transactions had economic substance because of "the need to finance HL and HS" and strengthen the financial statements of the companies. However, the loan transactions themselves did not result in an infusion of finances into HL and HS given that the loan proceeds were immediately returned to Dart. Further, petitioners have not presented any credible evidence to substantiate the claim that the balance sheets of the Dart companies were strengthened as a result of the loans or that Mr. Oren adopted the form of the loan transactions in order to accomplish such a result. Petitioners'

assertion that the combined balance sheets were made stronger by the loan transactions adopted, without more, is insufficient. Indeed, at trial, Mr. Oren was unable to explain exactly how the balance sheets were made stronger as a result of the loan transactions. Further, the combined balance sheets of the Dart companies do not reflect the various loan obligations as assets of the corporations. In fact, the obligations simply offset one another on the combined schedule of balance sheet information. See supra notes 5 and 6. We cannot see how the combined balance sheets were strengthened, or could even be perceived as strengthened by Mr. Oren or any financial institution.

We agree with respondent that Mr. Oren was nothing more than a "conduit through which Dart funneled money to HL and HS and back to itself."[18] The financial statements compiled for Mr. Oren and for the Dart companies are consistent with this finding. Mr. Oren's financial statements for 1993 and 1995 do not list the loans from Dart to Mr. Oren or the loans from Mr. Oren to HL and HS. The combined balance sheets of the Dart companies for 1993 and 1994 do not reflect the loan transactions. The combined

---

[18]In such a case, shareholders cannot claim an increase in basis for the entity investment, even if the entity is controlled or wholly owned. Estate of Bean v. Commissioner, 268 F.3d 553, 556-557 (8th Cir. 2001), affg. T.C. Memo. 2000-355; Bergman v. United States, 174 F.3d 928, 932 (8th Cir. 1999) ("No basis is created for a shareholder, however, when funds are advanced to an S corporation by a separate entity, even one closely related to the shareholder.").

schedules of balance sheet information for those years do reflect the loans; however, they show the loans as having been made from Dart to HL and from HL to Dart. See supra note 5. Mr. Oren's involvement in the loans is not shown. The 1993 and 1994 financial statements of the Dart companies certainly support respondent's position that Mr. Oren was a mere conduit among Dart, HL, and HS.[19]

We hold that Mr. Oren did not make an actual economic outlay to HL and HS. Accordingly, the increase in Mr. Oren's basis in the S corporations, attributable to the loans, was limited to $200,000, the amount lent from Mr. Oren's personal assets.[20]

Issue 2

The second issue for decision is whether for purposes of section 465 petitioners were at risk for the amounts lent to the

---

[19]Only the 1995 financial statements note Mr. Oren's involvement in the various loans. On the 1995 combined balance sheet, Mr. Oren's $200,000 loan to HL and HS from his personal resources is reflected; his role with respect to the loan amounts that originated with Dart is not listed. The combined schedule of balance sheet information for 1995 does note Mr. Oren's involvement with respect to those amounts: Dart is shown to hold a "Notes payable-stockholder" of $15.3 million and HL and HS are shown to owe "Notes payable-stockholder" of $13.5 million and $2 million. See supra note 6. Petitioners have not explained why the methodology employed in the 1995 combined schedule differs from that employed on the 1993 and 1994 combined schedules. Certainly, the form of the loans in 1993, 1994, and 1995 was identical. We are at a loss in identifying any nontax reasons why the methodology for the 1995 schedule was so abruptly changed.

[20]In the notice of deficiency, respondent has recognized this $200,000 increase in basis.

S corporations.  Respondent determined that the loans from Mr.
Oren to HL and HS were part of a loss-limiting arrangement under
section 465(b)(4), and, therefore, Mr. Oren was not at risk for
those amounts.[21]  Respondent argues that where loan transactions
are structured so as to remove "any realistic possibility" of
economic loss, taxpayers are not at risk for those amounts.
Petitioners contend that the existence of circular payments is
not per se a loss-limiting arrangement.  They argue that the
notes from Mr. Oren to Dart were fully recourse, and Mr. Oren's
obligation to repay the loans was absolute even if HL or HS
failed to repay.

Generally, a taxpayer is at risk in an activity to the
extent of money contributed or amounts borrowed for use in the
activity.  Sec. 465(b)(1).  A taxpayer is at risk with respect to
borrowed amounts if he or she is personally liable for repayment
of the loans or, otherwise, if he or she has pledged property as
security for loan repayment.  Sec. 465(b)(2).  However, a
taxpayer is not at risk, even for amounts received in a fully
recourse loan, if he or she is protected by a loss limiting
arrangement.  Sec. 465(b)(4).  Section 465(b)(4) provides:
"Exception.--Notwithstanding any other provision of this section,

---

[21]HL and HS were both involved in the leasing of equipment;
HL leased trailers and HS leased tractors.  Respondent argues,
and petitioners do not dispute, that equipment leasing is an
activity which is subject to the at risk provisions.  See sec.
465(c)(1)(C).

a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guaranties, stop loss agreements, <u>or other similar arrangements</u>." (Emphasis added.)  Respondent claims that Mr. Oren was protected from loss on the loans by "other similar arrangements" within the meaning of section 465(b)(4).

In the Eighth Circuit, to which this case is appealable, in other circuits, and in prior opinions of this Court, the "any realistic possibility of loss" standard has been adopted for determining whether a taxpayer is at risk under section 465(b)(4).  See <u>Young v. Commissioner</u>, 926 F.2d 1083, 1089 n.14 (11th Cir. 1991), affg. T.C. Memo. 1988-440;  <u>Moser v. Commissioner</u>, 914 F.2d 1040, 1048 (8th Cir. 1990), affg. T.C. Memo. 1989-142; <u>Am. Principals Leasing Corp. v. United States</u>, 904 F.2d 477, 483 (9th Cir. 1990); <u>Levien v. Commissioner</u>, 103 T.C. 120, 126 (1994), affd. 77 F.3d 497 (11th Cir. 1996); <u>Thornock v. Commissioner</u>, 94 T.C. 439, 453 (1990).  Thus, where a transaction is structured so as to remove any realistic possibility of the taxpayer suffering a loss, the taxpayer is not at risk for the borrowed amounts.  <u>Levien v. Commissioner</u>, <u>supra</u> at 126.

Petitioners argue that the any realistic possibility test is applied only in sale-leaseback cases and should not be applied in this case which does not involve a sale-leaseback.  Petitioners

argue that the sale-leaseback cases are distinguishable from the circular payment scenario in this case, because: (1) The sale-leaseback cases involved "identical and offsetting obligations of the loan and rental payments" whereas no rental payments are involved in this case; and (2) the sale-leaseback cases generally involved depreciation deductions whereas, in this case, Mr. Oren did not claim any such deductions. However, the facts in this case are decidedly similar to those involved in the typical sale-leaseback scenario. We cannot distinguish, for purposes of section 465(b)(4), the circular arrangements found in Moser v. Commissioner, supra; Am. Principals Leasing Corp. v. United States, supra; Levien v. Commissioner, supra; etc., from the circular arrangement found in this case. Accordingly, we find that the any realistic possibility standard is applicable.

Petitioners argue that, in any event, there was a realistic possibility that the circular chain of loan and interest payments would be broken and that Mr. Oren would be forced to repay the loans from Dart without collecting on the loans he made to HL and HS. Respondent claims that petitioners are simply hypothesizing about scenarios that might occur, none of which were likely to occur given the peculiar set of facts in this case including the circularity of payments, Mr. Oren's unlimited control over the companies, and the 375-day payment following demand provision in the notes. Respondent also argues that hypothetical events that

have not in fact occurred are not relevant for purposes of section 465(b)(4).

Given the particular arrangement in this case, Mr. Oren was insulated from actually repaying the Dart loans from his own personal resources except if: (1) Mr. Oren should choose to repay the Dart loans without enforcing the notes against HL and HS; or (2) one of the Dart companies was to become insolvent or bankrupt, and the chain of circular payments was to be broken. Obviously, the former is not sufficient to place Mr. Oren at risk. Thus, after considering all the facts and circumstances, we must determine whether there was any realistic possibility that the Dart companies would become insolvent or bankrupt and the chain of circular payments would be broken.

Much of Mr. Oren's testimony at trial was devoted to explaining the potential risks that he was exposed to by borrowing money from Dart and loaning money to HL and HS. Specifically, Mr. Oren suggested that the truckload carriers were exposed to considerable risks from potential tort claims that might arise from automobile accidents.[22] If Dart, HL or HS, were

---

[22]At trial, Mr. Oren recounted an accident involving one of Dart's carriers. Dart was found liable and a jury verdict of $7 million was rendered in that case. Mr. Oren emphasized that the verdict could have been substantially greater if it had involved the death of more than one person. For example, Mr. Oren recalled that the carrier narrowly missed a bus which was full of passengers. If the carrier had hit the bus, Mr. Oren speculated that a considerable verdict (in excess of $34 million) would not

(continued...)

to be involved in such an accident, the circle of loan payments might be broken, and Mr. Oren might be forced to repay Dart with his own resources.

After examining all the facts and circumstances, we cannot conclude that there was a realistic possibility that Mr. Oren would be required to repay the Dart loan with his own personal resources. There were significant cashflow and assets available in Dart, HL, and HS from which to satisfy any potential claims of up to $2 million without upsetting the circular offsets created by the loan transactions. And, claims of up to $34 million would be covered by a general insurance policy owned by the Dart companies.[23] With respect to claims in excess of $34 million; i.e., claims that might break the circular arrangement with the introduction of outside creditors, petitioners have produced no evidence of the frequency of such claims except the self-serving and speculative testimony of Mr. Oren. Indeed, at trial, Mr. Oren could testify only to one accident, an accident in which a verdict of $7 million was delivered. This figure in no way approaches $34 million. We cannot agree that there was a

_____

[22](...continued)
have been out of the question.

[23]The Dart Companies owned an insurance policy which provided general liability coverage. The policy provided that the Dart Companies were self-insured for the first $2 million of any claim but were covered for claims of up to $34 million. For claims over $34 million, the Dart Companies were self-insured.

realistic possibility of a greater than $34 million claim that would have rendered one of the Dart companies insolvent and caused the circularity of payments to be broken.

Petitioners also suggest that a small decline in the equipment values of HL and HS, or an economic slowdown in the trucking business may have resulted in the elimination of shareholder equity. Petitioners claim that with shareholder equity gone, HL and HS may have been unable to repay Mr. Oren. We disagree. Even if all the assets of HL and HS were to become worthless, those companies would still hold the notes executed by Dart. To repay its loans to Mr. Oren, HL and HS could have simply passed on the Dart notes to Mr. Oren. Mr. Oren could then offset his own obligations to Dart by canceling the Dart notes. Only in a case where HL and HS were to become insolvent or bankrupt; i.e., where outside liabilities were to exceed the value of existing assets in those companies, might the chain of offsetting obligations be upset. As stated above, this was highly unlikely.[24]

---

[24]We also point out that Dart regained possession of the funds it lent to Mr. Oren within days of the initial disbursements. Following the return of the funds, Dart no longer faced the risks normally associated with funds lent and retained by third parties. The benefit of Dart's "repossession" of the loan proceeds not only accrued to Dart, but also to Mr. Oren since it would be unlikely that Dart would pursue repayment of the loan proceeds if it already possessed them.

Furthermore, we do not believe it appropriate to engage in the type of speculation petitioners would have us make. Indeed, the legislative history of section 465(b)(4) indicates that Congress intended to exclude financial difficulties from the at-risk determination:

> For purposes of * * * [section 465(b)(4)], it will be assumed that a loss-protection guarantee, repurchase agreement or insurance policy will be fully honored and that the amounts due thereunder will be fully paid to the taxpayer. The possibility that the party making the guarantee to the taxpayer, or that a partnership which agrees to repurchase a partner's interest at an agreed price, will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938, at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88.]

In the Eighth Circuit, to which this case is appealable, and in at least one other circuit,[25] examination of "the worst-case

---

[25]See, e.g., Am. Principals Leasing Corp. v. United States, 904 F.2d 477, 483 (9th Cir. 1990):

> A theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of this subsection. We must be guided by economic reality. If at some future date the unexpected occurs and the taxpayer does suffer a loss, or a realistic possibility develops that the taxpayer will suffer a loss, the taxpayer will at that time become at risk and be able to take the deductions for previous years that were suspended under this subsection. [Citations omitted.]

See also Thornock v. Commissioner, 94 T.C. 439, 454 (1990) ("the potential bankruptcy of entities providing guarantees or loss protection to investors is not a consideration in determining the
(continued...)

scenario" is generally inappropriate for purposes of section 465(b)(4).  Moser v. Commissioner, 914 F.2d at 1048.[26]  Examining whether a greater than $34 million lawsuit was plausible would require us to utilize such a "doomsday" approach.  We decline petitioners' invitation to do so.

Accordingly, we hold that the loans that Mr. Oren made to HL and HS did not increase petitioners' basis in those companies for purposes of section 1366(d)(1)(B).  Petitioners' ability to deduct losses for taxable years 1993, 1994, and 1995 is therefore limited to basis amounts determined under section 1366(d) that do not include those loans.  We also hold that petitioners were not at risk for the amounts borrowed by Mr. Oren for use in HL and HS.  Therefore, petitioners' loss deductions from those companies are limited under section 465(a) to amounts for which petitioners are otherwise at risk.

Decision will be

entered for respondent.

---

[25](...continued)
application of sec. 465(b)(4) unless and until the bankruptcy actually occurs").

[26]But see Emershaw v. Commissioner, 949 F.2d 841, 845-848 (6th Cir. 1991), affg. T.C. Memo. 1990-246.