# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2104

_____

Larry Bergman; Patricia Bergman,     *
    *
        Plaintiffs - Appellees,     *
    *    Appeal from the United States
v.     *    District Court for the
    *    District of Minnesota.
United States of America,     *
    *
        Defendant - Appellant.     *
    *

_____

Submitted: February 11, 1999
Filed: April 19, 1999

_____

Before McMILLIAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Larry and Patricia Bergman, husband and wife, brought this tax refund suit against the United States to recover certain amounts they paid for the 1990 tax year because of a disallowed deduction for operating losses of one of several corporations owned or controlled by Larry Bergman.  The district court granted their motion for summary judgment, and the United States appeals.  We reverse and remand.

During 1990 Larry Bergman was the president and owner of three S corporations: Advanced Flex, Inc. (AFI), AF2, Inc. (AF2), and AF3, Inc. (AF3).[1] Each corporation had its own manufacturing plant at a separate site and its own employees. AFI was started in 1976, and Bergman incorporated AF2 in 1984. These two companies manufactured rigid multilayer printed circuit boards, and both had been profitable in most years. AFI focused on medium-to-large quantity production runs while AF2 specialized in smaller or more experimental orders. AF3 was established in 1989, primarily with assets purchased from Honeywell. AF3 manufactured flexible printed circuit boards and was never profitable. Its revenues in 1990 did not cover costs, and it sustained a loss of $1,512,917 for the year.

AF3 received a number of cash infusions from Bergman and from AF2. Bergman made an initial capital contribution of $20,000 to AF3 in November 1989, and later that month lent it $5000. In December 1989 he advanced $50,000 to the corporation, and he also loaned it an additional $150,000 during February and March of 1990. Bergman drew on a $200,000 personal line of credit at Marquette Bank to finance most of these advances. AF2 also made cash advances to AF3 during 1990 and received notes in return. The loans from AF2 to AF3 totaled $1,690,000 by December 20, 1990, and unpaid interest accrued on them.

Near the end of 1990, Bergman was advised that he would not be able to deduct all of AF3's losses on his personal income tax return because his basis in the corporation was insufficient. Under the Internal Revenue Code a taxpayer can only

---

[1]Bergman owned all of the voting stock of AF2 and AF3 and approximately 97.5 percent of the voting stock of AF1. It appears that his sons owned additional non-voting stock in AFI and AF2 but that there was no non-voting stock in AF3.

increase his basis in an S corporation by adding capital or loaning money to it. I.R.C. § 1366(d). The $1,690,000 debt AF3 owed to AF2 did not affect Bergman's basis in AF3 because it did not run directly to him. In order to increase his personal basis in AF3, Bergman arranged a series of transactions on December 20, 1990 to restructure the debt the corporation owed AF2. First, AF3 issued checks totaling $1,690,000 to AF2 to repay the loans it had made during 1990. Next, AF2 loaned Bergman the same amount, issuing him checks for $780,000 and $910,000 and receiving notes from him in return. Finally, Bergman wrote checks to AF3 for $780,000 and $910,000 and it issued notes of indebtedness to him. Thus, when all the transactions were concluded, AF3 owed the $1,690,000 debt to Bergman instead of to AF2, and the Bergmans deducted this amount as an operating loss on their 1990 tax return.

All of the December 20 checks were drawn on accounts maintained at Marquette Bank by Bergman and the two corporations. The funds cleared simultaneously during that day's account reconciliation, and at the end of the day the same amount of funds was in each account as at the beginning of the day. AF3's books reflected its indebtedness to Bergman, and interest was accrued on the loan but not paid. Interest was also accrued on the AF2 loans and was eventually paid off in full in 1992.

AF3 continued to face financial troubles during 1991. Bergman made some additional loans to it during the course of that year, and then on December 31 he contributed to AF3's capital several notes the corporation had given him, including the $780,000 and $910,000 notes of December 20, 1990.[2] Also on December 31, 1991 Bergman used a $200,000 distribution he received from AF2 to pay back to the company approximately one year's worth of interest on the loans he had received from it.

---

[2]After the contribution to capital, AF3's remaining debt to Bergman was $214,761.67.

Bergman executed a major corporate restructuring during 1992, and sometime during that year the Internal Revenue Service (IRS) began to examine the December 20, 1990 transactions more closely.[3] On July 1, 1992 Bergman consolidated his three corporations into one and paid off several outstanding debts. AF3 borrowed money from AFI to pay Bergman interest of $287,813 on its outstanding debts. AFI paid a $2,533,387 dividend to Bergman who in turn repaid AF2 $2,768,507.01 in loans and interest. This transaction settled all amounts owed on the notes for $780,000 and $910,000 given on December 20, 1990. AF3, which had never become profitable, was dissolved after its assets were transferred to AFI in return for AFI's assumption of its liabilities. In addition, AF2 was merged into AFI, creating a single S corporation for accounting and tax purposes. Following the restructuring, AFI continued to operate the businesses and plants formerly owned by AF2 and AF3, but in 1996 the assets which had belonged to AF3 were sold.

The Bergmans deducted operating losses of $1,512,917 for AF3 on their 1990 personal income tax return. The IRS disallowed most of this deduction in its 1992 audit on the theory that the December 20 transactions had not increased Bergman's basis in AF3 and the couple was therefore not entitled to deduct the full amount.[4] Additional tax of $378,360 plus $168,446 in interest was assessed. The auditor reasoned that Bergman had made no actual economic outlay during the December transactions and they thus could not have increased his basis in AF3. The auditor requested technical assistance, and the national office of the IRS issued a technical

---

[3]It is not clear exactly when the IRS investigation began, but there is a letter in the record from Bergman's accountant, dated June 16, 1992, responding to IRS queries regarding the December 20, 1990 transactions.

[4]$1,358,288 of the deduction was disallowed.

advice memorandum[5] which concluded that under the economic outlay doctrine Bergman's basis had not been increased.

The Bergmans paid the tax and interest due, and then filed an administrative claim for a refund. After six months elapsed with no action, they filed suit in the district court to compel a refund in accordance with I.R.C. §§ 6531(a)(1) and 7422. After discovery and briefing, they moved for summary judgment. The government argued that the December 20 transactions had no economic substance as there had been no actual outlay of Bergman's funds.[6] It also argued that summary judgment would be improper because evidence had been presented sufficient for a reasonable factfinder to infer that the loans had not been intended to be repaid and thus were not genuine.

---

[5]A technical advice memorandum is a statement of the IRS position regarding a specific set of facts; it may not be cited as precedent. I.R.C. § 6110(b), (j)(3).

[6]The Bergmans have suggested that the government has changed its argument on appeal, abandoning the position that there was no actual economic outlay and arguing instead that the December 20 transactions did not have any economic substance. These are not distinct theories, however, but rather the same argument presented at different levels of generality. Loan transactions, like all transactions, must have independent economic substance to confer tax benefits on the parties. See, e.g., Knetsch v. United States, 364 U.S. 361, 364-65 (1960). The tax benefits of creating indebtedness thus may be set aside if the taxpayer's economic situation has not actually changed. See, e.g., Drobny v. Commissioner, 86 T.C. 1326, 1346 (1986), Karme v. Commissioner, 73 T.C. 1163, 1186-87 (1980), aff'd, 673 F.2d 1062 (9th Cir. 1982). Actual indebtedness is created only where there is an economically significant change in the taxpayer's wealth; in other words, there must be an actual economic outlay that leaves the taxpayer poorer in a material sense. See, e.g., Perry v. Commissioner, 54 T.C. 1293, 1295-96 (1970), aff'd, 1971 WL 2651 (8th Cir.).

5

The district court concluded that undisputed facts established that the December 20, 1990 transactions increased Bergman's basis in AF3 and that the government had not presented facts to show the transactions were anything other than valid loans. It cited in support Gilday v. Commissioner, 43 T.C.M. (CCH) 1295 (1982) (shareholders acquired basis in their S corporation by restructuring a bank loan to the corporation), and it reasoned that the economic outlay doctrine was a "guaranty" doctrine inapplicable to a "loan" case and that the government's reliance on Underwood v. Commissioner, 535 F. 2d 309 (5th Cir. 1976), was therefore misplaced. The court granted the Bergmans' motion and ordered the government to refund to them income taxes and interest paid for 1990 after recalculating their tax liability based upon a tax basis in AF3 increased by the $1,690,000 loan.

The government appeals from the judgment and argues the court should find that Bergman's basis was not increased as a matter of law and that it is entitled to judgment or remand the case for further proceedings. It asserts that genuine issues of material fact prevent summary judgment for the Bergmans and that questions remain whether the December 20 transactions were genuine and whether they had sufficient economic substance to increase Bergman's basis in AF3. The taxpayers respond that undisputed facts establish that as a matter of law Bergman's December 20 checks to AF3 increased his basis in the corporation.

II.

Summary judgment is reviewed de novo and is only proper if, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). An issue is material if it could affect the outcome of the case under the applicable substantive law, and a genuine issue is raised when the evidence presented in the district court is "such

6

that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All inferences and credibility determinations must be made in favor of the non-moving party. Id. at 255; Lundell Mfg. Co. v. American Broad. Cos., 98 F.3d 351, 358 n.2 (8th Cir. 1996).

Subchapter S of the Internal Revenue Code provides that a small business may choose to have its profits and losses allocated pro rata to its shareholders and reported on their individual income tax returns rather than pay corporate income tax. I.R.C. § 1366(a). Corporations making elections under this subchapter essentially function as "pass-through" entities for tax purposes; however, S corporation losses may only be deducted to the extent a shareholder has basis in the corporation. I.R.C. § 1366(d). This limitation prevents a shareholder from deducting more than he has invested in the corporation. See S. Rep. No. 85-1983 (1958), reprinted in 1958 U.S.S.C.A.N. 4791, 5008. Basis in an S corporation may be acquired either by contributing capital or directly lending funds to the company.[7] I.R.C. § 1366. No basis is created for a shareholder, however, when funds are advanced to an S corporation by a separate entity, even one closely related to the shareholder. Golden v. Commissioner, 61 T.C.

---

[7]I.R.C. § 1366(d)(1) provides that:

> The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) [allows shareholders to deduct their pro rata shares of an S corporation's loss] for any taxable year shall not exceed the sum of—
> > (A) the adjusted basis of the shareholder's stock in the S corporation . . .
> > (B) the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder . . .

Losses that cannot be deducted in one year may be carried over indefinitely. I.R.C. § 1366(c).

343 (1973) (partnership); <u>Prashker v. Commissioner</u>, 59 T.C. 172 (1972) (estate); <u>Burnstein v. Commissioner</u>, 47 T.C.M. (CCH) 1100 (1984) (S corporation).

The parties agree that AF3 was an S corporation with losses in excess of $1.5 million in 1990 and that the loans which AF2 had made to AF3 did not increase Bergman's basis in AF3, but the key question is whether the December 20 loan restructuring did increase his basis. The government argues that the December 20 transactions did not create basis because they did not have any real economic consequences and did not involve an actual outlay of Bergman's funds. At a minimum, it argues, there are real factual disputes regarding whether the loans from AF2 to Bergman and from him to AF3 were genuine, that is whether or not at the time they were made the parties intended to enforce them. The taxpayers respond that summary judgment was properly granted because undisputed facts show that Bergman loaned $1.69 million to AF3 and thus increased his basis in the corporation. In their view, the $1,690,000 loaned by AF2 to AF3 earlier in 1990 was actually Bergman's money and the December 20 transactions merely corrected a mistake in the way the loan had been originally structured. The original loans from AF2 to AF3 were in substance loans from Bergman to AF3 because he wholly owned AF2 and it was actually his money that was placed at risk. They acknowledge that basis in AF3 was not created for Bergman when the original loan from AF2 to AF3 was made, but argue that this was only because the transaction did not comply with the form requirements of § 1366. After the restructuring, the loans ran directly from Bergman to AF3 so the form requirements were satisfied and additional basis in AF3 had been created for Bergman. They further argue that the economic outlay doctrine is not an obstacle to their recovery because Bergman made an actual payment of $1,690,000 to AF3.

As a general rule a transaction must have a purpose, substance, or utility beyond creating a tax deduction for it to have that tax effect. <u>Knetsch v. United States</u>, 364 U.S. 361, 365-67 (1960); <u>Gregory v. Helvering</u>, 293 U.S. 465, 469-70 (1935). Tax

8

minimization is not an improper objective of corporate management, but transactions may be disregarded if they are not actually what they are claimed to be. Haberman Farms Inc. v. United States, 305 F.2d 787, 791(8th Cir. 1962). In line with this general rule, a stockholder must make an actual economic outlay to increase his basis in an S corporation. Reser v. Commissioner, 112 F.3d 1258, 1264 (5th Cir. 1997); see also Selfe v. United States, 778 F.2d 769, 772 (11th Cir. 1985); Underwood v. Commissioner, 535 F.3d 309 (5th Cir. 1976); Hitchins v. Commissioner, 103 T.C. 711, 715 (1994). A taxpayer claiming a deduction must show it was based on "'some transaction which when fully consummated left the taxpayer poorer in a material sense.'" Perry v. Commissioner, 54 T.C. 1293, 1296 (1970), aff'd, 1971 WL 2651 (8th Cir.) (citation omitted).

The economic outlay doctrine does not apply only to loan guarantees, but it has been used to explain that a shareholder who guarantees a bank loan to an S corporation does not create additional basis because he is only secondarily and conditionally liable. See Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Uri v. Commissioner, 949 F.2d 371, 373-74 (10th Cir. 1991); Brown v. Commissioner, 706 F.2d 755, 757 (6th Cir. 1983). But see Selfe v. United States, 788 F.2d 769 (11th Cir. 1985). The principle underlying the doctrine extends beyond such circumstances to transactions which purport to be direct loans. See, e.g., Underwood,535 F.3d 309 (no basis created by an exchange of notes rearranging loan of funds from a C corporation to an S corporation). Transactions which are purported to create loans from shareholders to S corporations do not create basis if there has been no actual outlay of the shareholder's funds. See Reser v. Commissioner, 112 F.3d 1258, 1264 (5th Cir. 1997) ("It is well established that a shareholder cannot increase his basis in his S corporation stock without making a corresponding economic outlay."); see also Wilson v. Commissioner, 62 T.C.M. (CCH) 1122 (1991); Shebester v. Commissioner, 53 T.C.M. (CCH) 824 (1987); Burnstein v. Commissioner, 47 T.C.M. (CCH) 1100 (1984).

It is possible for a loan made as part of a loan restructuring to create additional basis under § 1366(d) since any genuine increase in indebtedness adds basis. For example, basis was created when a shareholder, who had previously only guaranteed a loan to an S corporation, borrowed funds in an arm's length transaction from a bank and then loaned them to the corporation. Gilday v. Commissioner, 42 T.C. M. (CCH) 1295 (1985). The involvement of an independent third party lender was critical to the result because there is no question that a lender such as a bank intends to force repayment, truly placing the shareholder's money at risk. When all of the entities involved in a transaction are owned by a single individual, however, it may be unclear whether the shareholder or the corporation is placed at risk. Cf. Underwood v. Commissioner, 535 F.2d 309, 312 (5th Cir. 1976). The rationale of the cases has placed "a heavy burden on shareholders who seek to rearrange the indebtedness of related closely held S corporations." Bhatia v. Commissioner, 72 T.C.M. (CCH) 696 (1996). The existence of a close relationship between the parties to the transaction "is not necessarily fatal if other elements are present which clearly establish the bona fides of the transactions and their economic impact." Id.

The Fifth Circuit was faced with a factual situation similar to this case in Underwood v. Commissioner, 535 F.2d 309 (5th Cir. 1976). In Underwood, a transaction restructured a loan originally made from a C corporation owned by the taxpayers to an S corporation which also belonged to them. The S corporation first surrendered $110,000 worth of the C corporation's notes and marked them paid. The taxpayers then gave the S corporation their personal demand note for $110,000 and they received from the C corporation a demand note for the same amount. The Fifth Circuit held that no basis had been created in the taxpayers because it was not clear that they would ever have had to repay the loan to the C corporation. Until they actually paid the debt, they could not be said to have made an additional investment that would increase their adjusted basis. Id. at 312. The fact that no new funds were actually advanced was further evidence that the loans were not genuine. Id. Other

10

courts have similarly emphasized that a loan to an S corporation does not create basis in taxpayers when it is not clear that their money is in fact at risk. Brown v. Commissioner, 706 F.2d 755, 756-57 (6th Cir. 1983); Hafiz v. Commissioner, 75 T.C.M 1982 (CCH) (1998).

On the taxpayers' motion for summary judgment, the facts and the inferences from them must be viewed in favor of the government. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). When the undisputed facts are viewed in favor of the government, it is not clear that the loans created on December 20 were genuine. Although Bergman ultimately repaid the loans to him from AF2, the evidence construed in favor of the government does not show that he intended to do so at the time of the transaction. Bergman testified in his deposition that he could not recall if any collateral secured the loans and that he never intended to enforce his loan to AF3 by foreclosing on any collateral in the event of a default. The only actual economic outlay may have been the original loans from AF2 to AF3 since the subsequent transactions could be viewed as merely a series of offsetting entries among bank accounts held in the same bank by entities controlled by Bergman. On the Bergmans' motion for summary judgment, it cannot be held that Bergman's actual indebtedness was increased. When the evidence is viewed in the light most favorable to the government, material issues remain whether on December 20, 1990 Bergman intended to repay the loan to AF2, and whether he gave money to AF3 on that day which made him poorer in a material sense. On this record summary judgment should not have been granted to the taxpayers.

Accordingly, the judgment is reversed and the case is remanded to the district court for further proceedings.

A true copy.

11

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.