# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1448

_____

Donald G. Oren; Beverly J. Oren,      *
                                      *

           Appellants,          *

                                        *    Appeal from the United States

       v.                                *    Tax Court.

                                          *

Commissioner of Internal Revenue,     *

                                          *

           Appellee.           *

_____

Submitted:   December 18, 2003

Filed:    February 12, 2004

_____

Before LOKEN, Chief Judge, WOLLMAN, and HANSEN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

       This appeal follows the tax court's ruling affirming the Commissioner of Internal Revenue's ("Commissioner") determination of deficiencies in Donald G. and Beverly J. Oren's (collectively "Orens") 1993, 1994, and 1995 joint tax returns. The tax court held that because the funds Mr. Oren ("Oren") purportedly loaned to two

S corporations[1] were neither "actual economic outlays" nor "at risk," the Orens were not entitled to the claimed deductions.   We affirm.

## I.

The Oren family owned three S corporations that performed various functions within the family's trucking business.[2]  Dart Transit Company ("Dart") was a motor carrier that provided "truckload" service throughout the lower 48 states.   Dart contracted with independent drivers, who leased or owned their tractors, to haul the cargo in Dart trailers.   Many of these independent contractors "leased-to-purchase" their tractors from a second family corporation, Highway Sales ("HS").   Dart used trailers leased from a third family corporation, Highway Leasing ("HL").   Because they owned and then leased trucking equipment, HL and HS had significant ordinary tax losses generated by the accelerated depreciation of their equipment, while simultaneously enjoying significant operating profits during the years in question.

On the recommendation of his personal financial advisers, and with the intent to deduct the depreciation losses of HL and HS from his income, Oren attempted to restructure his investment in the family's trucking businesses. He, Dart, HL, and HS entered into a series of loan transactions whereby Dart loaned, over three years, approximately $15 million to Oren, who, in turn, made loans totaling the same amount to HL and HS, both of which, over time, loaned the same amount back to

---

[1]The Internal Revenue Code provides that certain small business corporations which file an election with the Commissioner shall be taxed as "pass-through" entities.   These corporations, called S corporations, pass their earnings and losses to their owners, who must account for the corporation's results on their personal income tax returns.   26 U.S.C. §§ 1361, 1362, and 1366.

[2]The Orens, their children, and a number of trusts established for the benefit of the children, owned Dart; Mr. Oren owned HS and HL outright.   He, personally, had voting control of each of the S corporations involved in the transactions at issue.

Dart.[3] Each loan transaction within a cycle occurred on the same day or within a few days of each other. The terms of the loans, including interest rate (7% annually) and repayment conditions (on demand plus 375 days), were the same in each transaction. Dart's checks were drafted against its sweep account with First Bank; First Bank permitted Dart to loan funds to Oren so long as he contemporaneously loaned the same amount to another related entity. All checks were drawn on the individual or entity's bank account. Oren signed all of the notes himself except the note from HS to him, which was signed by HS's president. Dart, Oren, HL, and HS paid all interest due under the loan agreements by check. Each of the parties to the transactions paid off their obligations when the Commissioner notified the Orens of the deficiencies for 1993, 1994, and 1995.

After the first year of transactions, and again after additional transactions in the following years, the Orens claimed increased basis in HL and HS and deducted the corporations' loses from their income. The Commissioner audited the Orens' returns for the three years and disallowed the increase in basis and the deductions. The Orens timely petitioned the tax court, which held a trial before affirming the Commissioner's finding of substantial deficiencies.[4] First, the tax court held that the loans failed to increase the Orens' basis in the S corporations under 26 U.S.C. § 1366(d) because the Orens had not made the "actual economic outlay" necessary to qualify under the subsection. Second, even if the loans properly increased the Orens' basis in HL and HS, the tax court held that they were nevertheless not entitled to the

---

[3]In 1995, Oren also loaned $200,000 of his own money to HL and HS. The Commissioner allowed an increase in basis for this amount. The $200,000 is, therefore, not at issue in this case.

[4]The Commissioner found the Orens deficient in the following amounts:

1993:   $1,375,232
1994:   $2,138,632
1995:   $1,777,271

deductions because the funds were not "at risk" within the meaning of 26 U.S.C. § 465.  For the Orens to be entitled to deduct HL and HS's losses, the transfer of funds must satisfy both § 1366(d) and § 465.

We review the tax court's findings of fact for clear error and its conclusions of law de novo.  Moser v. Commissioner, 914 F.2d 1040, 1044 (8th Cir. 1990).

## II.

The Internal Revenue Code provides that a shareholder of an S corporation is liable for tax on his or her pro rata share of the corporation's income.  26 U.S.C. § 1366.  Such a shareholder is also entitled to deduct his or her pro rata share of the corporation's losses.  The loss deduction is limited by the shareholder's basis in the S corporation. 26 U.S.C. § 1366(d)(1).  Any genuine indebtedness of the corporation to the shareholder increases basis under § 1366.  Thus, where a shareholder loans money to the corporation, the shareholder's basis in the corporation increases and so does the amount of loss he or she can deduct.  Oren's basis in the family's trucking business was in Dart; the deductible losses were in HL and HS.

Congress intended to limit a shareholder's ability to deduct an S corporation's losses by the amount the shareholder invested in the corporation. Bergman v. United States, 174 F.3d 928, 931 (8th Cir. 1999).  In determining whether a loan is an investment, we have adopted the tax court's formulation of the "actual economic outlay" doctrine, which states that, for basis to increase, a loan from a shareholder to an S corporation must be an actual economic outlay of money by the shareholder.  Id. at 930 n.6 (citing Perry v. Commissioner, 54 T.C.1293, 1295-96 (1970) (holding that offsetting book entries fail to increase basis because there is no actual outlay by the shareholder)).  This actual economic outlay must leave the taxpayer "poorer in a material sense."  Id. at 932.  The doctrine ensures that the transaction has some substance or utility beyond the creation of a tax deduction.  Id.  The shareholder's own funds must be at risk.  Id. at 933-34.  Thus, shareholder guarantees of bank loans

-4-

to the corporation or shareholder pledges of property as security for bank loans to the corporation do not increase the shareholder's basis. Id. at 933 (collecting cases). This is because the shareholder is only secondarily and contingently liable.

Only where the shareholder provides his own money (or money he is directly liable for) to the S corporation, will basis increase. So, a shareholder who borrows money in an arm's length transaction and then loans the funds to the S corporation, is entitled to an increase in basis. Id. (citing Gilday v. Commissioner, 43 T.C.M. (CCH) 1295 (1982)). The arm's length element is important because "[w]hen all of the entities involved in a transaction are owned by a single individual . . . it may be unclear whether the shareholder or the corporation is placed at risk." Id. But close relationships among the parties are not fatal to the shareholder's claim of increased basis "if other elements are present which clearly establish the bona fides of the transactions and their economic impact." Id. (quoting Bhatia v. Commissioner, 72 T.C.M. (CCH) 696 (1996)). Put simply, the corporation must actually be indebted to the shareholder for the shareholder's own money.

Oren maintains that the loans were real investments and, as such, properly increased his basis in both HS and HL. He notes that the loan agreements were legally binding, properly memorialized, and recorded on the corporations' books. He also points out that because the funds were loaned to him by Dart with the approval of First Bank, a third party was involved in the transactions. Additionally, he testified that he had every intention of enforcing HS and HL's obligations to him and that Dart intended to enforce the obligations against him. Essentially, he argues that because the loans were valid and enforceable, he stood to lose under them in the event of a financial crisis at HL or HS.

To illustrate his point, Oren proposed the following hypothetical. Assume that HL is subject to a large tort judgment that consumes most or all of its assets. In such a case, the judgment creditor could seek to collect on the judgment by enforcing the

note from Dart to HL, which represents the loan proceeds HL received from Oren and then passed on to Dart. Dart would have to pay the judgment creditor and then seek to collect on its note from Oren. Because the judgment creditor would have consumed most if not all of HL's assets, Oren would not be able to collect against HL. Thus, Oren would be personally liable to Dart for the full amount of the loans without the possibility of collecting from HL. This, Oren argues, illustrates that the loans had the requisite economic substance.

The hypothetical assumes that Dart, which Oren controls, would call in its loan to Oren. Oren points out that although he is the controlling shareholder of each of the corporations involved, his wife and children serve as officers of the corporations and and have rights under Minnesota law as minority shareholders of Dart to enforce the obligations.

We agree with the tax court that Oren's loans to HL and HS had no economic substance and, thus, were not real economic outlays. True, Oren and his corporations observed all of the formalities necessary to create legal obligations. The notes were signed; checks were issued and cashed. But there were no arm's length elements in these transactions. No external parties were involved. The bank's involvement was extremely limited. At most, its funds were only in play for a number of days. Usually, the bank's check was replaced with one from HL or HS. Although there was the very slight possibility that HL or HS could suffer a catastrophic judgment, such an event would still have a direct impact only on Dart because Dart was the recipient of the loans from HL and HS. For such an event to have a direct effect on Oren, Dart would have to choose to enforce Oren's obligation to it, a decision that would have to be made by Oren, who controlled all voting shares in Dart. Accordingly, one must assume the occurrence of a great number of unlikely facts as a postulate to a circumstance in which Oren would suffer personal economic loss as a result of the lending transactions. It should be noted that he would suffer no additional loss (over his previous investments), as a result of the loans, by a simple decline in the value of

any of the corporations. He has not increased his total investment in any of the businesses. It should also be noted that in all of the offsetting book entry cases where we have held that basis does not increase, there was the theoretical possibility that an outside creditor with priority could seek to collect on the shareholder's note.

Oren's loans were not actual economic outlays. He was in the same position after the transactions as before; he was not materially poorer afterwards. The transactions much more closely resemble offsetting book entries or loan guarantees than substantive investments in HL and HS.

**III.**

Even if the Orens' basis in HL and HS increased under § 1366(d), to be entitled to the claimed deductions the Orens must establish that the loans satisfy the at risk requirement of § 465, which provides that a taxpayer involved in an equipment-leasing business may deduct a loss from that activity "only to the extent of the aggregate amount with respect to which the taxpayer is at risk . . . for such activity at the close of the taxable year." 26 U.S.C. § 465. The amount at risk is the amount of money the taxpayer has invested in the business (or the value of property contributed) that may actually be lost from the activity. Moser v. Commissioner, 914 F.2d 1040, 1048 (8th Cir. 1990). For borrowed money to be at risk the taxpayer must be "personally liable for the repayment of such amounts . . . ." 26 U.S.C. § 465(b)(2). Borrowed money is not at risk if it is "borrowed from any person who has an interest in such activity or from a related person . . . ." 26 U.S.C. § 465(b)(3). Similarly, such funds are not at risk if the taxpayer is "protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." 26 U.S.C. § 465(b)(4). The provision responds to the use of nonrecourse financing and other loss-limiting devices to increase basis but limit risk. Its purpose is "to suspend at risk treatment where a transaction is structured – by whatever method – to remove any realistic possibility that the taxpayer will suffer an economic loss . . . ." Moser,

914 F.2d at 1048 (quoting <u>Baldwin v. United States</u>, 904 F.2d 477, 483 (9th Cir. 1990)).

In determining whether funds are at risk, we use economic reality as our guide. <u>Id</u>. The "theoretical possibility that the taxpayer will suffer economic loss is insufficient to avoid the applicability of [§ 465]." <u>Id</u>. In <u>Moser</u>, we held that a circular lending arrangement, where no single obligation was likely to be called in without the entire cycle of loans being called in, yielded no funds that were genuinely at risk.[5] <u>Id</u>. at 1049.

The at risk analysis is very similar to the actual economic outlay analysis discussed above. <u>Cf</u>. <u>Bergman</u>, 174 F.3d at 933 ("courts have similarly emphasized that a loan to an S corporation does not create basis in taxpayers when it is not clear that their money is in fact at risk."). We look to the economic reality of the situation to determine whether there was a realistic chance that Oren might lose the money he loaned to HL and HS, or, rather, whether the funds were protected from loss by the arrangement of the transactions.

We conclude that the money Oren loaned to the corporations was not truly at risk because the possibility that he would suffer a direct loss was so remote. He was protected from personal loss by the circular nature of the loan transactions.

The decision of the tax court is affirmed.

_____

[5]While it is true that in <u>Moser</u> no cash changed hands, the formality of exchanging checks does not lend economic substance to the transactions involved in the instant case.