T.C. Memo. 2012-160

UNITED STATES TAX COURT

JAMES MAGUIRE AND JOY MAGUIRE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MARC MAGUIRE AND PAMELA MAGUIRE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 11049-10, 11050-10.　　　　Filed June 6, 2012.

Ps owned two S corporations whose businesses were related:
one an auto dealership, the other, a finance company that purchases
customer notes from the auto dealership. During the years in issue the
finance company operated at a profit and the dealership operated at a
loss. Ps did not have sufficient bases in the dealership to deduct its
losses. Ps had substantial bases in the finance company.

At the end of each year the finance company owned substantial
accounts receivable due from the dealership. At the end of each year
Ps received distributions of the accounts receivable from the finance
company and then contributed them to the related dealership in order to
increase their bases in the dealership enough to allow for the deduction
of its losses. R disallowed the claimed loss deductions on the basis of
R's determination that Ps' actions were insufficient to increase their

bases in the dealership because the transactions between Ps and their related S corporations did not amount to Ps' making an economic outlay.

Held: Shareholders in two related S corporations are not prohibited from receiving a distribution of assets from one of their S corporations and then contributing those assets into another of their S corporations in order to increase their bases in the latter. The effect is to decrease the shareholders' bases in the S corporation making the distribution and thereby reducing the shareholders' ability to get future tax-free distributions from the distributing S corporation, while increasing the shareholders' bases in the S corporation to which the contributions are made. The fact that the two S corporations have a synergistic business relationship and are owned by the same shareholders does not preclude accomplishing Ps' goal, so long as the underlying distributions and contributions actually occurred. We find that these transactions did actually occur.

F. Larkin Fore, for petitioners.

Mark D. Eblen, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: In these consolidated cases, respondent determined deficiencies and penalties as follows:

James and Joy Maguire
docket No. 11049-10

|       |            | Accuracy-related penalty |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------------------|
| 2004  | $765,923   | $153,184.60 |
| 2005  | 162,868    | 32,573.60 |
| 2006  | 378,510    | 75,702.00 |

Marc and Pamela Maguire
docket No. 11050-10

|       |            | Accuracy-related penalty |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------------------|
| 2004  | $315,071   | $63,014.20 |
| 2005  | 176,330    | 35,266.00 |
| 2006  | 376,123    | 75,224.60 |

After concessions,[1] the issues for decision are: (1) whether petitioners James and

---

[1]In the notice of deficiency relating to petitioners Marc and Pamela Maguire, respondent recharacterized Marc Maguire's income from CNAC, Inc. (CNAC), for the 2004 and 2005 tax years as nonpassive and disallowed his rental real estate passive activity losses. Respondent now concedes that Marc Maguire's income from CNAC for the 2004 and 2005 tax years was passive. Therefore, respondent concedes that Marc and Pamela Maguire's passive real estate losses for 2004 and 2005 may be used to offset Marc Maguire's passive income from CNAC for those years. In the notice of deficiency respondent also determined, and Marc and Pamela Maguire have not contested, that they had: (1) unreported interest income of $14,485 from CNAC for the 2004 tax year; (2) unreported compensation income in the form of fringe benefits of $10,952 for the 2004 tax year; (3) unreported compensation income in the form of fringe benefits of $12,810 for the 2005 tax year; (4) unreported compensation income in the form of fringe benefits of $2,160 for the 2006 tax year; (5) a $3,000 decrease of their deduction for advertising

(continued...)

Joy Maguire are entitled to deduct S corporation losses of Auto Acceptance, Inc.

(Auto Acceptance), for the years 2004, 2005 and 2006 and a net operating loss

carryback of Auto Acceptance from 2006 to 2004; (2) whether Marc and Pamela

Maguire are entitled to deduct S corporation losses of Auto Acceptance for the

years 2005 and 2006 and a net operating loss carryback of Auto Acceptance from

2006 to 2004; (3) whether Marc and Pamela Maguire are entitled to a $25,000

deduction for passive losses from real estate rental activity for 2006; and (4)

whether petitioners are liable for accuracy-related penalties under section 6662(a).[2]

At the time the petitions were filed, petitioners resided in Kentucky.

---

[1](...continued)
expenses for the 2004 tax year; and (6) a $4,788 decrease of their charitable
contribution deduction for the 2004 tax year.

With regard to petitioners James and Joy Maguire, in the notice of deficiency
respondent determined, and they have not contested, that they had: (1) unreported
interest income of $15,106 from CNAC for the 2004 tax year; (2) unreported
compensation income in the form of fringe benefits of $28,333 for the 2004 tax
year; (3) unreported compensation income in the form of fringe benefits of $28,333
for the 2005 tax year; (4) unreported compensation income in the form of fringe
benefits of $27,333 for the 2006 tax year; and (5) a $3,232 decrease in their
charitable contribution deduction for the 2004 tax year.

[2]Unless otherwise indicated, all section references are to the Internal Revenue
Code as amended and in effect for the years in issue, and all Rule references are to
the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

I. James and Joy Maguire

Petitioners James and Joy Maguire are husband and wife with the filing status of married filing jointly for the tax years 2004, 2005, and 2006. During the years at issue James and Joy Maguire owned a majority interest in CNAC and James owned a majority interest in Auto Acceptance. CNAC and Auto Acceptance were both S corporations. S corporations are passthrough entities that generally do not pay income tax. Rather, the income and losses of S corporations are passed through to their shareholders, who must include the income or losses on their individual income tax returns.

In the notice of deficiency issued to James and Joy Maguire, respondent disallowed losses that they claimed from Auto Acceptance for the taxable years 2004, 2005, and 2006 of $1,446,442, $423,449, and $1,978,539, respectively, because respondent determined that those losses were in excess of James Maguire's adjusted basis in Auto Acceptance.[3] For the same reason, respondent also disallowed a net operating loss carryback of $792,893 from Auto Acceptance's

_____

[3]The deductibility of a shareholder's loss from an S corporation is limited to the sum of the shareholder's adjusted basis in the shareholder's stock in the S corporation and the adjusted basis of any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1).

2006 tax year that James and Joy Maguire claimed on their 2004 Form 1040X, Amended U.S. Individual Income Tax Return. James and Joy Maguire received a refund and tax credit of $229,292 on the basis of their amended return. The refund claim for the 2004 tax year was processed and paid by respondent's service center before the examination for the tax years in issue.

## II. Marc and Pamela Maguire

Petitioners Marc and Pamela Maguire are husband and wife with the filing status of married filing jointly. Marc is the son of James and Joy Maguire. During the years at issue Marc Maguire owned a minority interest in CNAC, and during 2005 and 2006 he owned a minority interest in Auto Acceptance. In the notice of deficiency issued to Marc and Pamela Maguire, respondent disallowed losses claimed from Auto Acceptance for 2005 and 2006 of $406,844 and $1,900,950, respectively, because respondent determined that those losses are in excess of Marc Maguire's adjusted basis in Auto Acceptance. For the same reason, respondent also disallowed a 2004 net operating loss carryback of $768,710 from Auto Acceptance's 2006 tax year that Marc and Pamela Maguire claimed on an amended return for 2004. Marc and Pamela Maguire received a refund and tax credit totaling $277,121, on the basis of their amended return for 2004.

III. The S Corporations

Auto Acceptance is a car dealership, and CNAC is a finance company that deals exclusively with Auto Acceptance's customers. Auto Acceptance is primarily engaged in the purchase of used vehicles at auction and the resale of those vehicles. CNAC purchases retail installment notes related to the vehicles that Auto Acceptance sells. For the tax years at issue Auto Acceptance and CNAC both elected to be taxed as S corporations under section 1361.

A. Ownership

As of December 31, 2004, James Maguire owned 100% of Auto Acceptance. During 2005 James Maguire made a gift of 49% of his interest in Auto Acceptance to Marc Maguire. As of December 31, 2005 and 2006, James Maguire owned 51% of Auto Acceptance and Marc Maguire owned 49%. James Maguire was an officer of Auto Acceptance for the 2004, 2005, and 2006 tax years, and Marc Maguire was an officer for the 2005 and 2006 tax years.

As of December 31, 2004, 2005, and 2006, James Maguire owned 49.05% of CNAC, Joy Maguire owned 2%, and Marc Maguire owned 48.95%. For the tax years 2004, 2005, and 2006 James Maguire was an officer of CNAC. For the tax years 2005 and 2006 Marc Maguire was an officer of CNAC.

B.  Basis

In 2004, 2005, and 2006 CNAC operated at a profit and Auto Acceptance operated at a loss.  Before the end of 2004 petitioners were advised by their accountants at Katz, Sapper & Miller, LLP (Katz, Sapper & Miller), that James did not have sufficient basis in Auto Acceptance to deduct its losses on his individual income tax return.

As a result, Katz, Sapper & Miller advised James that he could increase his basis in Auto Acceptance by receiving distributions of $1,682,373 from CNAC, which he could then contribute to Auto Acceptance.  The effect would be to increase James' basis in Auto Acceptance so that he could deduct Auto Acceptance's losses on his individual return.  Since James and Joy Maguire owned 51.05% of CNAC and Marc owned the other 48.95%, it was necessary for James to borrow Marc's portion of the distribution.  James executed a note to Marc for his share of the distribution.  An initial attempt to carry out Katz, Sapper & Miller's plan involved the issuance of checks totaling $1,682,373 from CNAC to James and Marc Maguire, which James could then contribute to Auto Acceptance.  James, Joy, and Marc had an adjusted basis in CNAC of at least $1,682,373; however, CNAC did not have sufficient funds in its bank account to make a cash distribution of $1,682,373 to its owners.

After learning of their clients' inability to make a cash contribution to Auto Acceptance, Katz, Sapper & Miller advised them to pursue an alternative method of increasing James' basis in Auto Acceptance which would not require CNAC to make a cash distribution to its owners. Katz, Sapper & Miller advised petitioners that an identical result would be reached if a distribution of accounts receivable owed to CNAC by Auto Acceptance was made from CNAC to James, Joy, and Marc. Marc would lend his portion of the accounts receivable to James, who would then contribute the accounts receivable to Auto Acceptance, increasing James' basis in Auto Acceptance enough to allow for the deduction of Auto Acceptance's losses on his 2004 Federal income tax return. This advice was followed.

CNAC distributed $1,682,373 in accounts receivable to James, Joy, and Marc Maguire on or before December 31, 2004. Auto Acceptance owed at least this amount to CNAC before the distribution. Marc lent his share of accounts receivable to James, who then contributed them to Auto Acceptance. James executed a note to Marc for the amount of the loan.

The advice of Katz, Sapper & Miller was followed in subsequent years. In 2005 CNAC distributed $1,500,000 in accounts receivable to its shareholders on December 31, 2005, and the receivables were then contributed by petitioners to

Auto Acceptance. In 2006 CNAC distributed $3,500,000 in accounts receivable to its shareholders on December 31, 2006, and the accounts receivable were then contributed to Auto Acceptance. Auto Acceptance owed at least these amounts to CNAC before the distributions in 2005 and 2006. The respective distributions from CNAC and the respective contributions to Auto Acceptance were apportioned according to James', Joy's, and Marc's ownership interests.[4]

The distributions and contributions of the accounts receivable were carried out by the execution of separate written shareholder resolutions regarding the distributions and contributions, which were signed at the end of 2004, 2005, and 2006, respectively. Adjusting journal entries were made to the corporate books in the year following the taxable year to which they related, at the time Auto Acceptance's and CNAC's yearly audit was conducted. In 2005 and 2006 James was a 51% shareholder and Marc was a 49% shareholder in Auto Acceptance.

At the end of each of the tax years 2004, 2005, and 2006, petitioners' respective bases in CNAC equaled or exceeded the amounts of distributions from CNAC to petitioners.

---

[4]There were very slight differences in petitioners' respective ownership percentages of CNAC and Auto Acceptance. Neither party made any argument that this difference has any significance to the outcome of these cases.

OPINION

Pursuant to section 1366, a shareholder of an S corporation is liable for the tax on his pro rata share of the corporation's gross income. A shareholder is also entitled to deduct his pro rata share of an S corporation's losses. See sec. 1366(a); Broz v. Commissioner, 137 T.C. 46, 60 (2011). Losses deductible by a shareholder are limited to the shareholder's basis in the corporation. See sec. 1366(d); Bergman v. United States, 174 F.3d 928, 931 (8th Cir. 1999). As a result, losses cannot exceed the sum of the shareholder's adjusted basis in his or her stock in the S corporation and the shareholder's adjusted basis in any indebtedness of the S corporation to the shareholder. Sec. 1366(d)(1)(A) and (B). A shareholder's basis in his stock is increased by his contributions of capital to the corporation. See secs. 1012, 351(a), 358(a)(1).

Economic Outlay

In determining whether a particular transaction qualifies as a shareholder investment, a taxpayer must make an actual "economic outlay". Underwood v. Commissioner, 63 T.C. 468, 477 (1975), aff'd, 535 F.2d 309 (5th Cir. 1976); Perry v. Commissioner, 54 T.C. 1293, 1296 (1970), aff'd, 27 A.F.T.R.2d 71-1464 (8th Cir. 1971); Oren v. Commissioner, T.C. Memo. 2002-172, aff'd, 357 F.3d 854 (8th Cir. 2004). A taxpayer makes an "economic outlay" when he incurs a cost or is left

poorer in a material sense after the transaction. <u>Putnam v. Commissioner</u>, 352 U.S. 82, 85 (1956); <u>Ruckriegel v. Commissioner</u>, T.C. Memo. 2006-78; <u>Oren v. Commissioner</u>, T.C. Memo. 2002-172; <u>see</u> <u>Estate of Bean v. Commissioner</u>, 268 F.3d 553, 558 (8th Cir. 2001), <u>aff'g</u> T.C. Memo. 2000-355; <u>Bergman</u>, 174 F.3d at 932.

In order for petitioners to have sufficient bases in Auto Acceptance to deduct the losses claimed for the years in issue, they must have made an actual "economic outlay" when they contributed the accounts receivable to Auto Acceptance. We find petitioners did make the required economic outlay.

Respondent contends that the written yearend resolutions and the subsequent adjusting corporate journal entries are insufficient to increase petitioners' bases in Auto Acceptance under section 1366(d). Much of respondent's position is rooted in his factual conclusion that the distributions and contributions of accounts receivable never actually took place. However, the record sufficiently establishes that petitioners were advised by their team of accountants and attorneys, before the end of each year in issue, to use the distributions and contributions of the accounts receivable in order to increase their bases in Auto Acceptance for the years in issue and that this advice was actually followed. Petitioners James and Marc Maguire both testified that Katz, Sapper & Miller advised them to effectuate the accounts

receivable transaction at the end of each year in issue and that they followed this advice. In addition, Jeffrey Taylor, a certified public accountant (C.P.A.) and partner with Katz, Sapper & Miller, and Kevin Sullivan, a tax attorney, C.P.A., and tax partner with Katz, Sapper & Miller,[5] testified that they advised petitioners to make the distributions and contributions of accounts receivable before the end of each of the taxable years in issue and that they determined the best way to implement their plan was to have petitioners execute the corporate resolutions and make adjusting journal entries on the corporate books. The resolutions dated December 31, 2004, 2005, and 2006, and the adjusting journal entries, coupled with the relevant testimony and the pattern of following this procedure for three straight years, is persuasive evidence that petitioners followed Katz, Sapper & Miller's advice and effected the distributions and contributions at the end of each year in issue.

---

[5]Mr. Taylor has been a C.P.A. since 1980 and concentrates his practice in the retail automotive industry. Mr. Sullivan has been an attorney and a C.P.A. since 1993. Mr. Sullivan has worked in C.P.A. firms as an accountant and in a law firm as a tax attorney. As a tax partner, Mr. Sullivan is engaged as a technical tax resource by other members of his firm, as well as by its clients. We include information regarding Messrs. Taylor and Sullivan's backgrounds only to demonstrate that they were individuals whose advice petitioners sought regarding their income tax situation, on the basis of their experience and qualifications. We have not relied on their legal conclusions in reaching our decision.

Respondent also argues that no economic outlay was made, because the resolutions and adjusting journal entries made to the books of the related companies were devoid of any economic reality and did not alter the economic positions of the parties. We find that the distributions and contributions did have real consequences that altered the positions of petitioners individually and those of their businesses. As petitioners point out, the distributions and contributions created actual economic consequences for the parties, because the accounts receivable had real value in that they were legitimate debts that Auto Acceptance owed to CNAC and thus were legitimate assets of CNAC.[6] Petitioners' contribution of the accounts receivable resulted in their being poorer in a material sense in that the accounts receivable were no longer collectible by them individually.

When petitioners received the accounts receivable from CNAC, as they had every right to do, and contributed them to Auto Acceptance, that transaction reduced the liabilities of Auto Acceptance; made Auto Acceptance solvent in terms of its assets exceeding its liabilities; and increased the net worth of Auto

---

[6]These "accounts receivable" that Auto Acceptance owed to CNAC are to be distinguished from the interest-bearing notes that Auto Acceptance received from car buyers and sold to CNAC.

Acceptance, exposing a greater amount of its assets to its general creditors.[7]  At the same time, petitioners' bases in CNAC were reduced by the amounts of the accounts receivable that CNAC had distributed to them, thereby reducing their ability to receive future tax-free distributions from CNAC.  See sec. 1368.[8]

---

[7]Petitioners stress that the risk involved in exposing more of Auto Acceptance's assets to its creditors was more than hypothetical, because by mid-2004 the Kentucky attorney general had instituted a lawsuit against petitioners and their businesses claiming millions of dollars on the basis of consumer fraud claims. Petitioners contend that the risk of the loss to Auto Acceptance's creditors, including vendors that it alone dealt with, when viewed in consideration of the attorney general's lawsuit, was very real and the additional net worth in Auto Acceptance created by the capital contribution was put at greater risk, making them poorer in a material sense.

[8]In general, a shareholder's basis in the stock of an S corporation is increased by the shareholder's pro rata share of the corporation's income, decreased by the shareholder's pro rata share of the corporation's losses and deductions, and also decreased by the amounts of distributions not includable in income.  See sec. 1367. Sec. 1368(a) provides that a "distribution of property made by an S corporation with respect to its stock to which (but for this subsection) section 301(c) would apply shall be treated in the manner provided in subsection (b) or (c), whichever applies." Sec. 1368(c) generally provides that if such a distribution is made by an S corporation out of previously taxed undistributed earnings and profits it shall not be included in income to the extent it does not exceed the adjusted basis of the stock. If the distribution is made by an S corporation which has no accumulated earnings and profits, pursuant to sec. 1368(b) the distribution shall not be included in gross income to the extent that it does not exceed the adjusted basis of the stock, and the amount of the distribution which exceeds the adjusted basis of the stock shall be treated as gain from the sale or exchange of property.

The fact that the CNAC accounts receivable were distributed to petitioners and then contributed to a related entity does not require a finding that there was no economic outlay. We have previously considered this issue and have held that "the fact that funds lent to an S corporation originate with another entity owned or controlled by the shareholder of the S corporation does not preclude a finding that the loan to the S corporation constitutes an 'actual economic outlay' by the shareholder." Ruckriegel v. Commissioner, T.C. Memo. 2006-78; see also Yates v. Commissioner, T.C. Memo. 2001-280; Culnen v. Commissioner, T.C. Memo. 2000-139, rev'd and remanded on another issue, 28 Fed. Appx. 116 (3d Cir. 2002). The fact that petitioners contributed intangible assets to Auto Acceptance, rather than cash, does not preclude increases in their bases. The tax basis of an S corporation may be increased through the contribution of cash, tangible assets, or intangible assets (such as accounts receivable). See secs. 1012, 351(a), 358(a)(1); see also Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), aff'd, 875 F.2d 420 (4th Cir. 1989).

As a result of the transactions, the values of petitioners' investments in CNAC were diminished by the amounts of the receivables distributed to them. When petitioners contributed the accounts receivable to Auto Acceptance, the contributions increased their bases in Auto Acceptance and made them poorer

individually because they no longer owned the receivables in their individual capacities.

Respondent argues that the close relationships between the shareholders and the two S corporations warrants disregarding petitioners' attempt to increase their bases in Auto Acceptance. While it is appropriate to scrutinize the validity of transactions between related parties, we see no reason why shareholders in two related S corporations should be prohibited from taking distributions of assets from one of their S corporations and investing those assets into another of their S corporations, in order to increase their bases in the latter. The effect is to decrease the shareholders' bases in the S corporation making the distribution, thereby reducing the shareholders' potential future tax-free distributions from the distributing S corporation, while increasing the shareholders' bases in the S corporation to which the contribution is made. The fact that the two S corporations have a synergistic business relationship and are owned by the same shareholders should make no difference so long as the underlying distributions and contributions actually occurred. "[T]he existence of * * * [a close relationship between the parties] is not necessarily fatal if other elements are present which clearly establish the bona fides of the transactions and their economic impact." Bhatia v. Commissioner, T.C. Memo. 1996-429. As previously stated, we have found that

these transactions did actually occur. The fact that petitioners were motivated by tax considerations is not fatal. "Any one may so arrange his affairs that his taxes shall be as low as possible". Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), aff'd, 293 U.S. 465 (1935).

We find that petitioners made an actual economic outlay when they contributed the accounts receivable to Auto Acceptance. We hold that petitioners are entitled to their claimed bases increases in Auto Acceptance and their claimed S corporation losses for the years 2004, 2005, and 2006.

Marc and Pamela Maguire's Passive Real Estate Losses

In the notice of deficiency respondent disallowed $25,000 of Marc and Pamela Maguire's passive rental losses for the tax year 2006.

Section 469 generally disallows for the taxable year any passive activity loss. Sec. 469(a). A passive activity loss is defined as the excess of the aggregate losses from all passive activities for the taxable year over the aggregate income from all passive activities for that year. Sec. 469(d)(1). A passive activity is any trade or business in which the taxpayer does not materially participate, sec. 469(c)(1), or to the extent provided in regulations, any activity with respect to which expenses are allowable as a deduction under section 212, sec. 469(c)(6)(B).

Rental activity is generally treated as a per se passive activity regardless of whether the taxpayer materially participates. Sec. 469(c)(2), (4).

There are two principal exceptions to the general rule that rental activities are per se passive activities.

(1) Real Estate Professional

The first exception to the general rule is found in section 469(c)(7). Under that section, the rental activities of taxpayers in real property trades or businesses are not treated as per se passive activities but rather as trade or business activities, subject to the material participation requirements of section 469(c)(1). Sec. 469(c)(7); see also sec. 1.469-9(e)(1), Income Tax Regs. Petitioner Marc Maguire does not contend that he is a real estate professional, and the record does not establish that he is.

(2) Offset for Rental Real Estate Activities

The second exception to the general rule that rental real estate activities are per se passive activities (and therefore subject to the disallowance rule of section 469(a)) is found in section 469(i). That section provides that a taxpayer who "actively" participates in a rental real estate activity may deduct a maximum loss of $25,000 per year related to the activity. See sec. 469(i)(1) and (2). This exception

is subject to phaseout when the taxpayer's adjusted gross income (AGI) (determined without regard to any passive activity loss) exceeds $100,000. Sec. 469(i)(3).

The active participation standard can be satisfied without regular, continuous, and substantial involvement in an activity; the standard is satisfied if the taxpayer participates in a significant and bona fide sense in making management decisions (such as approving new tenants, deciding on rental terms, approving capital expenditures) or arranging for others to provide services such as repairs. Madler v. Commissioner, T.C. Memo. 1998-112.

On his 2006 Federal income tax return, Marc Maguire took the position that he was active in the management of his real estate activities and claimed the maximum deduction of $25,000. Respondent has not contested Marc Maguire's contention that he was active in the real estate management, and the record does not indicate otherwise. As a result, the claimed deduction should be disallowed only if Marc Maguire's AGI for 2006 is high enough that the phaseout rule applies. Sec. 469(i)(3).

Marc and Pamela Maguire reported a net operating loss for 2006 of $738,992. However, respondent disallowed $1,900,950 in claimed losses from Auto Acceptance and increased their AGI because he determined that they lacked the necessary basis in Auto Acceptance. As a result, respondent determined that

Marc and Pamela Maguire's AGI for 2006 exceeded $150,000, making them ineligible for the deduction.

Because we have decided the adjusted basis issue in petitioners' favor, Marc and Pamela Maguire will have negative AGI for purposes of their 2006 return. As a result, Marc and Pamela Maguire are not subject to the section 469(i)(3) phaseout limitation. We therefore find that petitioners Marc and Pamela Maguire are entitled to their claimed deduction of $25,000 for passive losses from real estate rental activity for 2006.

Section 6662(a) Accuracy-Related Penalties

Respondent determined accuracy-related penalties against James and Joy Maguire for the taxable years 2004, 2005, and 2006 of $153,184.60, $32,573.60, and $75,702, respectively. Respondent also determined accuracy-related penalties against Marc and Pamela Maguire for the 2004, 2005, and 2006 tax years of $63,014.20, $35,266, and $75,224.60, respectively.

Because of our holding in petitioners' favor on the adjusted basis issue and because of the parties' various concessions, respondent's section 6662(a) penalty computations must be adjusted accordingly in the event that petitioners are found liable for the penalties. We must decide whether petitioners are liable for the section 6662(a) penalties with respect to items not related to respondent's

determinations of their bases in Auto Acceptance, which include various determinations involving their receipt of unreported interest income and unreported fringe benefit income and the reduction of advertising expense and charitable contribution deductions.

Pursuant to section 6662(a) and (b)(1), a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax due to negligence or disregard of rules or regulations. "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code; this includes a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence has also been defined as the failure to exercise due care or the failure to do what a reasonable person would do under the circumstances. See Allen v. Commissioner, 92 T.C. 1, 12 (1989), aff'd, 925 F.2d 348, 353 (9th Cir. 1991); Neely v. Commissioner, 85 T.C. 934, 947 (1985). "Disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c).

Petitioners have not contested several of the adjustments respondent determined in the notice of deficiency. For their 2004 tax year James and Joy Maguire agree that they had unreported interest income from CNAC of $15,106 because they failed to impute interest income at the applicable Federal rate on

loans CNAC made to related parties. Marc and Pamela Maguire do not contest that they also had unreported interest income of $14,485 from CNAC for 2004.

Petitioners have also conceded that they had unreported fringe benefit income for the personal use of company-owned vehicles.[9] Petitioners were unable to provide records to respondent to substantiate the business purpose of the automobile use and indicated that such records had not been maintained. As a result, respondent's revenue agent determined that petitioners had used company automobiles for personal reasons.

Additionally, Marc and Pamela Maguire have not contested that they failed to substantiate advertising expenses for 2004 of $3,000.

Petitioners have also conceded that they claimed deductions for charitable contributions which they could not substantiate. James and Joy Maguire conceded that their charitable contribution deduction for 2004 be decreased by $3,232, while Marc and Pamela Maguire conceded that their charitable contribution for 2004 be decreased by $4,788.

---

[9]For the taxable years 2004, 2005, and 2006, James and Joy Maguire conceded that they had $28,333, $28,333, and $27,333 in unreported fringe benefit income from CNAC, respectively, for their personal use of company automobiles.

Marc and Pamela Maguire conceded that they had unreported fringe benefit income of $10,952, $12,810, and $2,160 for their personal use of company automobiles for the 2004, 2005, and 2006 taxable years, respectively.

Because petitioners failed to keep adequate books and records and to substantiate properly the items in question on their returns, we find that they were negligent and, therefore liable for the accuracy-related penalties with respect to the conceded adjustments.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.