T.C. Memo. 2005-217


UNITED STATES TAX COURT


ESTATE OF NORA KOLCZYNSKI, DECEASED, MATTHEW HOFFMEIER, EXECUTOR,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22096-03.          Filed September 20, 2005.


<u>John T. Catterson</u> and <u>Susan A. Teschner</u>, for petitioner.

<u>Monica E. Koch</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GOEKE, <u>Judge</u>:  Respondent determined a Federal estate tax

deficiency of $843,146 against the Estate of Nora Kolczynski (the

estate).  After concessions, the issue for decision is the value

of a tract known as Dawn Plantation (DP) which Nora Kolczynski

held at her death.[1]  The parties disagree as to the highest and best use of DP on the valuation date and the method to value DP. We hold that the highest and best use for  DP was a mixed use of recreation purposes and timber management.  We further hold that the fair market value of DP on the valuation date was $4,829,252.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference.

---

[1] The estate filed a sec. 2032A protective election with its estate tax return.  The estate has indicated its intent to perfect this protective election by filing an additional notice of election if we determine the value of DP to be greater than the amount it asserted at trial.  Respondent has indicated his intent to deny any such attempt.  This dispute raises the question of when the 60-day period begins to run for the estate to file a notice of election, and turns on the phrase "as finally determined" in sec. 20.2032A-8(b), Estate Tax Regs. Specifically, respondent argues that the value finally determined is his determination in the notice of deficiency, and the estate argues that it is this Court's determination of the property's value.  This issue will be addressed only if the estate files an additional notice of election and respondent denies the estate's filing.  An appropriate order will be issued addressing these contingencies.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

On July 8, 1999, Nora Kolczynski (decedent) died testate as a resident of the State of New York. The executor had a mailing address at c/o John T. Catterson, Esq., Hauppauge, New York, 11788, when the petition was filed. The executor's actual address is not in the record.

On the date of decedent's death, she held, among other things, 100-percent ownership of DP. Decedent's interest was reported by the estate on its Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. The date of death is the valuation date in this case. The estate reported that the value of DP on the valuation date was $4,378,013. The estate also made a protective election on Schedule A-1, Section 2032A Valuation.

Dawn Plantation

DP is in Greenpond, Colleton County, South Carolina, in an area known as ACE Basin. ACE is an acronym for the Ashepoo, Combahee, and Edisto Rivers, and ACE Basin includes about 350,000 acres of land. ACE Basin is part of the South Carolina lowlands, and the rivers are affected by tidal changes. Because of ACE Basin's location, it provides a notable ecosystem, and the ACE Basin Commission was founded to preserve ACE Basin in its natural and pristine condition. Colleton County is in southeastern South Carolina and is approximately 60 to 70 miles northwest from Hilton Head, a resort and retirement community.

Colleton County was ranked 21st in population growth in South Carolina, with an 11.3-percent increase during the period 1990 through 2000. There are neither zoning nor use restrictions in Colleton County.

The parties stipulate that DP comprises 2,095.12 acres. The record establishes that the main tract is 1,931.30 acres, and the five smaller tracts total 133.82 acres.[2] DP is north of U.S. Highway 17 and south of the Ashepoo River and is bisected east to west by Clover Hill Road. DP features timberlands, open fields, access to a shallow branch of the Ashepoo River, and 226 acres of what were historically rice fields. The rice fields have not functioned as such for decades and no longer have dikes to regulate water flow from tidal changes. DP is inhabited by an array of wildlife including deer and migratory water fowl.

Procedural History

On September 30, 2003, respondent issued a notice of deficiency in which he determined a Federal estate tax deficiency of $843,146. The deficiency included three increases to the value of decedent's taxable estate: (1) A $157,500 increase to the fair market value of decedent's residence; (2) a $1,112,979 increase to the fair market value of DP (a total value of $5,490,992); and (3) a $390,315 increase for the disallowance of executor's commissions and attorneys' fees.

_____

[2]The record does not explain the 30-acre discrepancy.

The estate timely petitioned the Court and challenged each adjustment respondent made.  The estate claims that the value of DP is overstated on the estate tax return.  The estate contends that the value of DP was $4,238,000 on the valuation date, which is $140,013 less than it reported on the estate tax return.

The estate has since conceded the $157,500 increase to the fair market value of decedent's residence.  The parties also agree that the estate may deduct 5 percent of the value of the probate assets located in South Carolina as executor's commissions, New York executor's commissions of $23,832, and $277,750 for attorney's fees.  These deductions require payment of the corresponding amounts.

                            OPINION

Section 2001 imposes a Federal tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States."  The value of a decedent's gross estate includes the fair market value of any interest the decedent held in property.  See secs. 2031(a), 2033; United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.  Fair market value reflects the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."  Sec. 20.2031-1(b), Estate Tax Regs.; United States v. Cartwright,

supra at 551.  Fair market value is an objective test that relies on a hypothetical buyer and seller.  See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Andrews v. Commissioner, 79 T.C. 938, 956 (1982).

A valuation analysis of property must reflect the highest and best use to which the property could be put on the relevant valuation date.  Symington v. Commissioner, 87 T.C. 892, 896 (1986); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986).  The highest and best use is a factual issue, Symington v. Commissioner, supra at 896; Skripak v. Commissioner, 84 T.C. 285, 320 (1985), in which we consider "'[t]he realistic, objective potential uses'", Symington v. Commissioner, supra at 896-897 (quoting Stanley Works & Subs. v. Commissioner, supra at 400 (citing United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir. 1958))).  This determination is not affected by whether the owner has or intends to put the property to such use.  Symington v. Commissioner, supra at 897.  Instead, we focus on "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future".  Olson v. United States, 292 U.S. 246, 255-256 (1934).

The parties disagree as to the highest and best use and the valuation method to be applied. Both parties presented the testimony of expert witnesses to support their respective positions.

A. Burden of Proof

The estate argues that respondent's notice of deficiency was arbitrary, and the burden of proof should shift to respondent. We do not find the notice of deficiency arbitrary. In addition, we decide this case on the preponderance of the evidence, and our analysis is not affected by the burden of proof. See Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), affg. T.C. Memo. 2003-212.

B. Experts

A witness that qualifies as an expert by knowledge, skill, experience, training, or education can give opinion testimony if his special knowledge will assist the Court in understanding the evidence or determining a fact at issue and if his opinion is supported by sufficient facts and is based on reliable principles and methods that were applied reliably to the facts of the case. See Fed. R. Evid. 702. We are, however, not bound by expert opinions and may reach a decision based on our own analysis of all the evidence in the record. Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Estate of

Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  Where experts offer conflicting estimates of fair market value, we must weigh each estimate by analyzing the factors they used to arrive at their conclusions.  Silverman v. Commissioner, supra at 933; Casey v. Commissioner, 38 T.C. 357, 381 (1962); see also Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998).

Each party offered expert testimony with respect to the value of DP.  The estate presented the testimony of Charles Middleton (Mr. Middleton), a South Carolina State-certified general real estate appraiser.  Mr. Middleton's report was attached to the estate tax return, which was received into evidence.  Respondent concedes that Mr. Middleton is an expert in appraising real estate.  The Court, however, limited Mr. Middleton's testimony to that of a rebuttal witness since the estate failed to comply with the Court's standing pretrial order to identify him in its pretrial memorandum as a witness it intended to call at trial.

The estate also presented the testimony of Thomas Hartnett (Mr. Hartnett), a South Carolina general real estate appraiser and a certified real estate brokerage manager, as an expert in land valuation.  Mr. Hartnett prepared an expert report in accordance with Rule 143(f), and the estate properly identified him as a witness in its pretrial memorandum.

Respondent presented the testimony of Robert O'Rear (Mr. O'Rear). Mr. O'Rear has a B.S. in forestry and has taken at least two valuation classes. His 30 years of work experience include appraising timber, timberland, cropland, and forest plantations. He prepared an expert report in accordance with Rule 143(f), and respondent identified Mr. O'Rear as a witness in his pretrial memorandum. Mr. O'Rear's professional training and work experience qualify him as an expert to value DP for estate tax purposes.

Each party urges us to reject the other party's expert's opinions. We may, however, accept or reject the opinion of an expert in its entirety, or we may be selective in the use of any portion thereof. Estate of Davis v. Commissioner, supra at 538; Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). Stated differently, we decide, as the trier of fact, the weight afforded any witness's testimony, and we are not compelled to accept any testimony even if it is uncontradicted. McGraw v. Commissioner, 384 F.3d 965, 972 (8th Cir. 2004), affg. Butler v. Commissioner, T.C. Memo. 2002-314; Paul E. Kummer Realty Co. v. Commissioner, 511 F.2d 313, 315 (8th Cir. 1975), affg. T.C. Memo. 1974-44.

C. Valuation Methodology and Highest and Best Use

The parties' disagreement over DP's value stems from two issues. First, what was the highest and best use to which DP could have been put on the valuation date? Second, what method should be used to value DP? We note that the valuation method petitioner urges us to apply and the method J. Richard Cox (Mr. Cox), an attorney and C.P.A., used to determine the value of DP that the estate reported on the estate tax return are different. Given this difference we will analyze the appraisals attached to the estate tax return in addition to the reports of the experts who testified.

1. The Estate Tax Return

Mr. Cox's report was attached to the estate tax return, but he was deceased at the time of trial. The valuation method Mr. Cox used aggregated the timber value and the land value. A land appraisal by Mr. Middleton and a timber appraisal by Scott Pellum (Mr. Pellum), a registered forester, were also attached to the estate tax return.

a. Land Appraisal

To determine the highest and best use for DP, Mr. Middleton considered four factors: (1) Physical possibility, (2) legal permissibility, (3) financial feasibility, and (4) maximum productivity (profitability). After considering these factors, Mr. Middleton concluded that DP's highest and best use was a

mixed use of agriculture, including timber, cow, and hog farming, and recreation, including hunting.

To value DP, he used the sales comparison approach (also referred to as the comparative sales approach). A sales comparison approach relies on recent sales of comparable properties to determine the value of the subject property. Mr. Middleton performed two separate analyses, one with respect to the main tract and a second with respect to the five smaller tracts.

In comparing DP's main tract to other tracts recently sold, Mr. Middleton subtracted the value of any improvements, such as the value of a house or other erected structures, and the merchantable timber on DP. In addition, he made adjustments for the size, waterfront access, and location and the period between the sale date and the valuation date. He identified sales of six comparable properties to value DP's main tract; however, he accorded greater weight to three given their geographic similarities to DP. Mr. Middleton concluded that the value of DP's largest tract on the valuation date was $1,275 per acre, for a total value of $2,500,275 (1,961 acres x $1,275 per acre). He rounded this to $2.5 million.

To value the five separate small tracts he again identified sales of six comparable properties. Because each tract was different in size and had different attributes, such as road

access, Mr. Middleton grouped similar tracts for valuation purposes. Using the comparable properties with similar attributes, he determined the combined value of the smaller tracts was $226,000 on the valuation date.

Mr. Middleton calculated the total appraised land value of DP as follows:

| | |
|---|---:|
| Main tract value--1,961.3 acres | $2,500,000 |
| Improvement value | 100,000 |
| Combined value of the five small tracts | 226,000 |
| Total | 2,826,000 |
| Rounded to | 2,825,000 |

### b. Timber Appraisal

Mr. Pellum determined the value of standing merchantable timber, and his report was attached to the estate tax return. Mr. Pellum did not testify at trial. In his report, Mr. Pellum used stands to identify specific forested acres on DP and determined the quality (pine sawtimber, chip-n-saw, pine pulpwood, hardwood sawtimber, and hardwood pulpwood) and volume of the timber in each stand. Using the Timber Mart-South, South Carolina Stumpage Prices, 2nd Quarter 1999, which provided per-ton prices for different timber qualities, he calculated the value of the merchantable timber on DP's 1,481 forested acres.

He determined, on the basis of these calculations, that the value of the merchantable timber on DP was $2,665,992.[3]

### c.    Value Reported on the Estate Tax Return

Mr. Cox valued DP as a business, specifically a sole proprietorship. Mr. Cox's valuation of DP relied on, among other things, Mr. Middleton's land appraisal and Mr. Pellum's timber appraisal. In his report, Mr. Cox stated: "While it is simple to add the land value to the timber value, such simple addition would result in a value determination greatly in excess of the true fair market value of the property." Mr. Cox opined that none of the timber acreage tracts with a value of less than $1,000 per acre should be harvested since cutting the timber in these areas would "result in tremendous decreases in value of these and the immediately surrounding acreage." Accordingly, he decreased the total timber value by $225,729. This adjustment resulted in a timber value of $2,440,263.

To determine the land value Mr. Cox referenced three different methods, one of which was Mr. Middleton's report. However, Mr. Cox ultimately accepted a single method for the land value in his report. The method he used was based on the State of South Carolina's assessed land value of DP of $1,470,200. His report indicates that the State's assessed value was approximately 80 percent of the fair market value. He therefore

---

[3]The parties stipulated this was the correct value.

concluded that the true fair market value of the land was $1,837,750 ($1,470,200/.80). As a result, Mr. Middleton's land value played no role in the amount reported by the estate on the Estate tax return.

Aggregating the adjusted timber value of $2,440,263, the adjusted land value of $1,837,750, and the $100,000 value of the improvements on the land, as determined by Mr. Middleton, Mr. Cox concluded that the fair market value of DP was $4,378,013.

2. Respondent's Valuation Method in the Notice of Deficiency

In his notice of deficiency, respondent stated that the value of DP was $5,490,992 on the valuation date. This was determined by aggregating the timber value in Mr. Pellum's report and the land value in Mr. Middleton's report. This method essentially disregarded any discounts Mr. Cox had applied and rejected Mr. Cox's land valuation method.

Mr. O'Rear concluded in his report that the highest and best use that DP could have been put to on the valuation date was a mixed use of recreation and agriculture. However, at trial he opined that DP should be valued as timberland since that was its only profitable use on the valuation date. Accordingly, he applied a summation approach to arrive at the value stated in the notice of deficiency.

3. Mr. Hartnett's Valuation Method

As stated above, the estate contends that the value of DP is

less than the amount it reported on the estate tax return.  The estate offered the testimony of Mr. Hartnett to support this lesser value.  In determining the highest and best use he considered the same four criteria considered by Mr. Middleton: (1) Physical feasibility, (2) legal permissibility, (3) financial feasibility, and (4) maximum productivity.  Mr. Hartnett determined that the highest and best use that DP could have been put to on the valuation date was mixed.  He effectively concluded that recreation was the primary use and timber management was the means to cover maintenance expenses.

Mr. Hartnett then used a sales comparison approach to determine the value of DP, which differed from the method Mr. Cox employed.  Mr. Hartnett identified sales of five comparable properties and made adjustments to the sale price of each for differences in size, date of sale, physical characteristics, location, and timber value.  He also adjusted for improvements on the properties.  The timber adjustment was determined by subtracting the per-acre timber value of the property from the per-acre value of the timber on DP; the difference was then multiplied by the property's total acreage.  After applying the improvement and timber adjustments, the adjusted sale price was determined and broken down to the per-acre sale price.  A time adjustment was next applied to the per-acre price of the property.  The amount of this adjustment depended on the number

of years between the property's date of sale and decedent's date of death.  After applying the time adjustment, the per-acre sale price was adjusted by the aggregate of the waterfront and size adjustments.  The waterfront adjustment was made by comparing the water access of the comparable property with that of DP.  Mr. Hartnett made positive and negative adjustments for water access where he thought appropriate.  The size adjustment took into account a premium paid for smaller parcels.  The greater the difference between the acreage of DP and the comparable property, the greater the amount of the adjustment.

### 4.    Highest and Best Use Analysis

The estate's position is that DP's highest and best use on the valuation date was mixed--recreation supported by timber farming.  Respondent contends that DP's highest and best use on the valuation date was as timberland since timber farming had been the sole profitable activity of DP until decedent's death. We disagree with respondent.

We begin by noting that Mr. O'Rear's rebuttal report states: "The current use is as a timberland/hunting plantation; and this is the highest and best use of the property." At trial, Mr. O'Rear explained that the best way to measure both uses was to value DP as timberland since, until decedent's death, that was its sole profitable activity. Given this apparent discrepancy, we give little weight to Mr. O'Rear's testimony on the highest and best use for DP.

As stated previously, we focus on "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future." Olson v. United States, 292 U.S. at 255-256 (emphasis added). Real property may be adaptable for multiple uses that are profitable in the reasonably near future. One such use may include leaving land in its natural and pristine state when considering the supply and demand for similar land.

ACE Basin is an exceptional ecosystem with many potential recreational uses, and property in ACE Basin is often purchased for those purposes. ACE Basin's attributes include diversified wildlife, open fields, and standing timber. Decedent used the land for recreational purposes such as hunting and horseback riding. DP's standing timber was cut only to assist in covering the expenses of maintaining the property. There are no zoning or use restrictions to limit DP's uses, but the record is devoid of

evidence indicating that DP could be used successfully for commercial or residential development in the reasonably near future. These facts, taken together, support a finding that the highest and best use for DP was a mixed use.

The testimony of Lucas Carter (Mr. Carter), the curator of DP, also indicates the highest and best use for DP was a mixed use. Mr. Carter credibly testified that clear-cutting the standing timber on DP would have significant adverse effects, the most significant being that wildlife would seek refuge elsewhere. When questioned about the period before such wildlife would return, Mr. Carter estimated that it would likely take 15 to 20 years for the timberland to regenerate before that would occur. The loss of wildlife and standing timber would clearly have a negative effect on the recreational value of DP.

After reviewing the record, we conclude that both the hypothetical buyer and seller having reasonable knowledge of all relevant facts would not disregard either the recreational or the timberland use. Accordingly, DP's highest and best use on the valuation date was a mixed use of recreation and timberland, with selective timber farming supporting the recreational value.

5. <u>Valuation Method Analysis</u>

The estate argues that a comparative sales approach is the proper method to value DP. Respondent, in contrast, contends that a summation method should be used. The summation method

proposed by respondent aggregates the merchantable timber value, the value of the land without timber and improvements (the bare land value), and the value of any improvements. The land value component in the summation method is based on the comparative sales approach.

Respondent relies on Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415, to support his position. The facts in Estate of Sturgis indicate that both parties agreed that the highest and best use of the Sturgis property was as timberland, and each expert had valued the Sturgis property by a standard methodology that aggregated the values of the separate components. The land valuation analysis relied on by the Court took into consideration accessibility for cutting the timber, soil data, timber data, and shape.

We find respondent's reliance on Estate of Sturgis is misplaced for three reasons. First, we are unpersuaded that Mr. Pellum's timber valuation did not apply a clear-cutting approach. Mr. Pellum did not testify, and his report does not indicate whether he considered the negative effects of clear-cutting all of the standing timber on more than 70 percent of DP's total acreage (1,481 forested acres/2,095.12 total acres). Second, none of the land valuations in this case, including Mr. Middleton's, considered timber-related issues such as soil quality, accessibility, and drainage as did the land valuation

relied on in <u>Estate of Sturgis</u>. Clear-cutting DP would negatively affect a subsequent land appraisal since the recreational uses would be significantly diminished. Third, the historic use of DP was a mixed use of recreation supported by timber management. Similarly, the comparable properties identified by the parties appear to have been sold for this use. We believe that arm's-length transactions provide a more accurate basis to value DP, compared to a summation of components as proposed by respondent.

D. <u>Valuation</u>

1. <u>Comparable Properties</u>

Mr. Hartnett identified sales of five comparable properties. Unlike Mr. Middleton, he compared those five properties with the entire DP acreage. Since Mr. Hartnett gave greater weight to two of these sales, we shall review those in detail.

The first sale was part of a section 1031 exchange in which Birchwood Holdings transferred 1,766 acres in Colleton County to Westvaco Corporation (collectively, the Birchwood sale), on January 29, 1999. Mr. Hartnett alleged that the total sale price was $3,620,000 because the purchaser transferred 2,344 acres of land, with roughly $1,370,000 of merchantable timber, and $2,250,000 of "boot".

The second sale involved 447.75 acres in Colleton County, known as the White House Plantation, on May 1, 1997. This tract

was contiguous with DP and sold for $1.1 million. Mr. Hartnett estimated that the values of the improvements and marketable timber were $150,000 and $425,000, respectively.

On the basis of the two principal sales of comparable properties, Mr. Hartnett determined a per-acre value of $1,975 for DP, which totaled $4,137,862 (2,095.12 acres x $1,975/acre). He then added $100,000 for the estimated value of all improvements to DP and concluded that the estimated market value of DP was $4,237,862, which he rounded to $4,238,000.

Respondent contests the use of the Birchwood sale on the basis that it was part of a section 1031 exchange and it was not in the "prestigious ACE Basin". Respondent argues that the public records reveal that the total value of the property transferred by the buyer was more than the amount Mr. Hartnett included in his report. We agree.

The facts regarding the Birchwood sale are insufficient for us to use it as a comparable property because we do not know the value of the 2,344 acres of land transferred by the purchaser. Mr. Hartnett could provide only the value of the merchantable timber thereon. Given this shortcoming, we do not believe that the Birchwood sale is relevant.

In contrast, we find the White House Plantation sale is relevant. The White House Plantation is contiguous with DP, and the sale occurred only about 2 years before decedent's death.

The main issue with this property is that it includes significantly less acreage than DP. While valuation is inherently imprecise, we should limit this inexactitude by relying on sales that require the fewest and smallest adjustments. Accordingly, this is the best available sale of comparable property.

2. Adjustments to the Sale Price of the White House Plantation

Mr. Hartnett made five adjustments to the sale price of the White House Plantation which took into consideration the distinctive characteristics of DP and the comparable property. The adjustments he made are summarized in the following table:

| Adjustments | White House Plantation |
|---|---|
| Sale price | $1,100,000 |
| Improvement adjustment | (50,000) |
| Timber adjustment | [1]144,625 |
| Adjusted price | 1,194,625 |
| Per-acre value | 2,668 |
| Time adjustment | [2]213 |
| Per-acre value with time adjustment | 2,881 |
| Water front adjustment | -0- |
| Size adjustment | [3](1,008) |

| | |
|---|---|
| Aggregate water front and size adjustments | (1,008) |
| Total adjusted per-acre value | 1,873 |

[1] This adjustment consists of the difference between the per-acre value of the timber on DP ($1,273) and the per-acre value of the timber on the White House Plantation ($950), multiplied by the White Houses Plantation's 447.75 acres. Mr. Hartnett rounded to get this amount.
[2] Based on a time adjustment of 8 percent.
[3] Based on a 35-percent size adjustment.

After adjustments, Mr. Hartnett determined in his report a per-acre value of $1,873 for the White House Plantation. We shall review each adjustment.

a.    Improvement Adjustment

Mr. Hartnett decreased the White House Plantation sale price by the amount its improvements exceeded the improvements on DP. The White House Plantation had improvements valued at $150,000. Thus, Mr. Hartnett reduced the sale price by $50,000. We find this adjustment acceptable.

b.    Timber Adjustment

The timber adjustment Mr. Hartnett used increased the per-acre value of the White House Plantation by the difference between the per-acre value of the timber on DP and the per-acre value of the timber on the White House Plantation. Respondent argues that this method does not account for the total value of the timber on DP. Respondent contends that the timber adjustment

should equal the excess of the value of the merchantable timber on DP over the value of the timber on the White House Plantation. We disagree with respondent.

We find that Mr. Hartnett's adjustment adequately accounts for the greater value of the standing timber on DP. We are determining DP's per-acre value using the comparable sales approach, and adjusting the per-acre value is consistent with this approach. Thus, we accept the amount of the adjustment in Mr. Hartnett's report.

### c. Time

The White House Plantation sale occurred about 2-1/3 years before the valuation date. Mr. Hartnett made a positive 8-percent adjustment to the per-acre value of the White House Plantation for this difference. Respondent did not object to this adjustment, and we have no reason to reject this adjustment. Thus, we will apply an 8-percent time adjustment.

### d. Size Adjustment

Mr. Hartnett made a 35-percent size adjustment to the per-acre sale price of the White House Plantation since it was about one-fourth the size of DP. Respondent objects to the size of this adjustment.

While we agree that some size adjustment is appropriate, we think that a 35-percent adjustment was unduly large. If the facts had demonstrated the White House Plantation was purchased

for residential or commercial development on account of its size, then Mr. Hartnett's 35-percent size adjustment might have been justified. Those facts are, however, not present. We therefore apply a 20-percent size adjustment.

e.    Location Adjustment

Mr. Hartnett did not make a location adjustment for the White House Plantation. Since the White House Plantation is contiguous with DP, we find that no adjustment is necessary.

3.    The Value of DP

Taking into account the adjustments described above, we find that the adjusted per-acre value of the White House Plantation is $2,305, as computed in the following chart:

| Adjustments | White House Plantation |
|---|---|
| Sale price | $1,100,000 |
| Improvement adjustment | (50,000) |
| Timber adjustment | 144,625 |
| Adjusted price | 1,194,625 |
| Per-acre value | 2,668 |
| Time adjustment | 213 |
| Per-acre value with time adjustment | 2,881 |
| Waterfront adjustment | -0- |
| Size adjustment | (576) |
| Location adjustment | -0- |
| Total adjusted per-acre value | 2,305 |

Applying this per-acre value using Mr. Harnett's methodology, we conclude that the value of DP on the valuation date was $4,829,252.

To reflect the foregoing,

An appropriate order will be issued.